**In re MICROSTRATEGY, INC. SECURITIES LITIGATION.**

No. Civ.A. 00–473–A.

United States District Court, E.D. Virginia.

Sept. 15, 2000.

Craig C. Reilly, Alexandria, VA, for plaintiffs.

Brendan V. Sullivan, Jr., Williams & Connolly, Washington, D.C., for defendant Microstrategy.

Leo S. Fisher, Bean, Kinney & Korman, P.C., Arlington, VA, for defendant PricewaterhouseCoopers.

## MEMORANDUM OPINION

ELLIS, District Judge.

The central question presented in these threshold dismissal motions in this securities fraud class action is the unresolved question of the meaning to be given to the state-of-mind pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA" or the "Act"). Specifically at issue are the meaning of the PSLRA's requirement that a complaint in a securities fraud action must allege sufficient facts giving rise to a "strong inference" of scienter and whether the Consolidated Amended Class Action Complaint ("Complaint") in this case meets that standard. Also at issue are questions as to (i) the materiality of the Complaint's allegations; (ii) whether a plaintiff must allege facts showing "culpable participation" on a defendant's part to state a claim for secondary "control group" liability under Section 20(a) of the Exchange Act; and (iii) the meaning of the contemporaneity requirement of Section 20A of the Exchange Act for insider trading liability.

### I. FACTUAL BACKGROUND

This securities class action[1] is brought by, and on behalf of, investors in securities of MicroStrategy between June 11, 1998 and March 20, 2000 (the "Class Period"), asserting claims against Defendant MicroStrategy, Inc. ("MicroStrategy" or the "Company"); Defendants Michael Saylor, Sanju Bansal, Mark S. Lynch, Stephen S. Trundle, Ralph Terkowitz, and Frank A. Ingari (collectively "the Individual Defen-

dants" and, along with MicroStrategy, the "MicroStrategy Defendants"); and Defendant PricewaterhouseCoopers ("PwC") under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the PSLRA, and under Rule 10b–5 promulgated thereunder. 15 U.S.C. §§ 78j(b), 78t(a), 78t–1; 17 C.F.R. § 240.10b–5.

Plaintiffs allege that on June 11, 1998, when MicroStrategy announced its Initial Public Offering ("IPO") of 4,000,000 shares of common stock, Defendants knowingly and purposefully, or recklessly, implemented and executed throughout the Class Period a "massive fraud on the investing public" in the form of a scheme artificially to distort the price of MicroStrategy securities. Allegedly at the heart of this fraudulent undertaking was the repeated inflation of revenues and earnings for the Company, which was accomplished through the improper recognition of revenues from software licensing and servicing contracts in violation of Generally Accepted Accounting Principles ("GAAP") and declared MicroStrategy accounting policies.[2] (Complaint ¶ 2.)[3] As a result, the MicroStrategy Defendants—with the consent and cooperation of PwC, the Company's auditor—presented investors with a false and misleading picture of MicroStrategy's financial condition and apparent growth. The allegations in the Amended Complaint ("Complaint") and public documents relied on by, and integral to, the Complaint further disclose the following about the MicroStrategy Defendants and PwC, respectively.[4]

---

1. Approximately two dozen class action securities fraud actions were filed in this District following MicroStrategy's March 20, 2000, announcement that it had significantly overstated its revenues. Following a hearing, these class actions were consolidated, and lead plaintiffs and lead counsel were designated pursuant to the PSLRA. *See In re Microstrategy, Inc. Sec. Litig.*, No. Civ. 00–473–A, 2000 WL 1200158 (E.D.Va. Aug. 18, 2000).

2. Generally Accepted Accounting Principles "are the conventions, rules, and procedures that define accepted accounting practices." *United States v. Arthur Young & Co.*, 465 U.S. 805, 811 n. 7, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984).

3. References to particular paragraphs in the Complaint hereinafter are marked by "¶ ____."

4. In deciding a motion to dismiss, a court is entitled to rely on public documents quoted by, relied upon, incorporated by reference in, or otherwise integral to the complaint, and such reliance does not convert the motion into one for summary judgment. *See Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir.1999); *In re Merrill Lynch Ltd. Partnerships Litig.*, 154 F.3d 56, 57 (2d Cir.1998); *Simons v. Montgomery County Police Officers*, 762 F.2d 30, 31 (4th Cir.1985); *Gasner v. County of Dinwiddie*, 162 F.R.D. 280, 282

MicroStrategy was founded in 1989 and is a developer and marketer of "e-business" software and related services that facilitate the transaction of business through electronic · and wireless media. MicroStrategy 'software allows companies to retrieve raw data and to turn that data into useful information. The Company also provides, *inter alia,* installation, maintenance, and consultation services to its clients. (¶ 25.a.) Since its inception, MicroStrategy's business has evolved from a focus on stand-alone software license and maintenance components to the provision of "multiple software products and services for use by the customers and very large numbers of customers' end users, ... often involv[ing] significant implementation and other consulting work which extend[ ] over periods of time." This evolution of the Company's business has allowed MicroStrategy to receive revenues from multiple sources, including product license fees, product support fees, and royalties from various sources. (¶ 25.b.)

The Individual Defendants are, and during the Class Period were, senior executives and/or directors of MicroStrategy: Defendant Saylor, a co-founder of MicroStrategy, was the President and Chief Executive Officer of the Company; Defendant Bansal was the Executive Vice President and Chief Operating Officer; Defendant Lynch was the Vice President, Finance, Chief Financial Officer, and Principal Financial and Accounting Officer of MicroStrategy; Defendant Trundle was the Senior Vice President of MicroStrategy, Technology; and Defendants Terkowitz and Ingari were Directors of MicroStrategy and members of MicroStrategy's Audit Committee. (¶ 20.) These Defendants allegedly prepared, reviewed, executed, and/or disseminated, and thereby controlled the content of, the Company's filings with the Securities and Exchange Commission ("SEC"), press releases, and other public representations. (¶¶ 21(a)–(f).) By virtue of their positions, the Individual

Defendants also allegedly had access to material, adverse nonpublic information regarding MicroStrategy's sales transactions, revenue recognition, and financial condition. (Complaint ¶ 111.)

The Complaint alleges that, throughout the Class Period, Defendants materially misrepresented MicroStrategy's revenues and earnings in violation of GAAP. Plaintiffs point to the Company's press releases and SEC filings concerning revenues and earnings for fiscal years 1997, 1998, and 1999 and for seven of eight interim quarters in 1998 and 1999, and to statements by Defendant Saylor that routinely highlighted "increased revenues" over consecutive periods, as providing MicroStrategy investors with the false impression that the Company's earnings and revenues were consistently increasing throughout the Class Period when, in fact, they were not. Plaintiffs also point out that, during the Class Period, MicroStrategy purportedly recognized and reported its earnings and revenues in conformance with the strictures of GAAP and the Company's declared revenue recognition policies, which stated, for example, that "[p]roduct license revenues are generally recognized upon the execution of a contract and shipment of a related software product, provided that no significant vendor obligations remain outstanding and the resulting receivable is deemed collectible by management." (¶ 27.) But, according to the Complaint, MicroStrategy's statements did not accurately portray the Company's financial status, and—contrary to the representations and filings made by the Defendants—the statements did not conform with either GAAP or MicroStrategy's own revenue recognition policies:

MicroStrategy reported increasing revenues and earnings which were achieved primarily by improperly recognizing revenues on purported contracts prior to agreements being finalized and/or when

(E.D.Va.1995), *aff'd sub nom. Gasner v. Board of Supervisors,* 103 F.3d 351 (4th Cir. 1996).

the agreements were subject to significant contingencies or yet-to-be-fulfilled obligations by the Company. Such practices violated [GAAP].

(¶ 6.)

During this period, MicroStrategy's stock—the initial offering price for which was $12 per share in June 1998—rose significantly in price, reaching a Class Period high of $313 in March 2000. (¶¶ 9, 26.) Moreover, each of the Individual Defendants during this period made private sales of stock, with aggregate proceeds of more than $90 million, and MicroStrategy and certain of the Individual Defendants, through various public offerings of MicroStrategy stock, received, in the aggregate, proceeds in excess of $80 million. (¶¶ 26, 40.) Furthermore, the Company announced on February 24, 2000, its intention to sell 6.5 million shares of stock, including 1.6 million shares owned by Defendant Saylor, in an effort to raise nearly $1 billion. (¶ 53.)

On March 6, 2000, *Forbes* magazine published an article questioning the timing of MicroStrategy's recognition of revenues on three contracts. The article pointed out that these contracts were not announced until after certain quarters had closed, but that the contracts were treated as if completed during those quarters. (¶ 55.) Then, on Monday, March 20, 2000, MicroStrategy announced that it would have to restate two years of its previously reported financial reports. By the end of that day, the price of MicroStrategy stock had fallen to $86.75, having closed at $226.75 on Friday, March 17, 2000. (¶ 14, 58.)

On April 13, 2000, the Company filed its SEC Form 10–K for the year ending on December 31, 1999. In this filing, MicroStrategy formally restated its previously reported revenues and earnings for the years ending on December 31, 1998, and December 31, 1999. On April 13, MicroS-

trategy also announced its intention to restate and adjust downward its reported revenues for the year ending on December 31, 1997. Then, on May 30, 2000, the Company filed its Amended Form 10–Q/As for the second and third quarters of 1999. These filings contained restated financials for years 1997 through 1999. These restatements revealed the extent of the discrepancy between MicroStrategy's previously reported financial figures and the actual ones.[5] Specifically, the Complaint alleges that:

- MicroStrategy reported revenues of $23.8 million for the second quarter of 1998. These revenues constituted a 100% increase over the same quarter in the previous year. The Company also reported net income of $942,000, or $0.03 per share—a 672% increase over the same quarter in the previous year. The subsequent restatement revealed that the reported net income of $942,000 should have been reported as a net loss of $1.1 million, and that the reported earnings per share of $0.03 should have been reported as a loss of $0.04 per share. (¶¶ 3, 32, 34.)

- MicroStrategy reported revenues of $27 million for the third quarter of 1998, an 83% increase over the same quarter in the previous year, and net income of $1.9 million, or $0.05 per share on a diluted basis—a 297% increase over the same quarter in the previous year.[6] (¶¶ 3, 35, 37.)

- The Company reported revenues of $35.7 million in the fourth quarter of 1998, a 90% increase over the same quarter in the previous year, and net income of $2.8 million, or $0.07 per share on a diluted basis—a 436% increase over the same quarter in the previous year. These figures were la-

---

**5.** These discrepancies are reflected in a chart provided by Plaintiffs that is attached to this Opinion as Appendix A.

**6.** According to the facts alleged in the Complaint, the third quarter of 1998 was the only

quarter in the Class Period for which MicroStrategy's reported net income per share was accurate and, therefore, not adjusted in the subsequent restatements. (¶¶ 3, 35, 37.)

ter restated to a net loss of $3 million, or $0.08 per share. (¶ 3, 38.)

- MicroStrategy reported that, for the 1998 fiscal year, it had revenues of $106.4 million—a 98.7% increase over the 1997 fiscal year—and net income of $6.2 million, or $0.16 per share on a diluted basis ($0.08 per share on a 2–for–1 stock split adjusted basis)—as compared to the previous year's net income of $0.1 million. Earnings for the 1998 fiscal year were later restated to a loss of $0.03 per share (on a 2–for–1 stock split adjusted basis). (¶¶ 3, 39, 41.)

- The Company reported that, for the first quarter of 1999, revenues had increased 80% to $35.8 million and that net income had increased 243% to $1.9 million, or $0.05 per share on a diluted basis. The earnings figures were later restated to reflect a net loss of $3.8 million, or a $0.10 loss per share. (¶¶ 3, 44.)

- For the second quarter of 1999, MicroStrategy reported revenues of $45.6 million, a 92% increase from the same quarter in the previous year, and net income of $3.2 million, or $0.08 per share on a diluted basis—a 241% increase over the prior year's comparable period. The restatement later revealed that the Company had a net loss of $3 million and no earnings in this quarter. (¶¶ 3, 46.)

- MicroStrategy reported for the third quarter of 1999 that its revenues amounted to $54.6 million and that its net income totaled $3.8 million—or $0.09 per share on a diluted basis—a 102% and a 97% increase, respectively, from the third quarter of 1998. These figures later were restated to reflect a net loss of $12.8 million, or a $0.33 loss per share. (¶¶ 3, 48.)

- For the fourth quarter of 1999, the Company reported revenues of $69.4 million, a 94% increase from the fourth quarter of 1998, and net income of $3.8

million, or $0.09 per share on a diluted basis—compared to net income of $2.8 million, or $0.07 per share diluted, over the same quarter in 1998. Earnings were later restated to reflect net losses of $17.2 million, or a $0.41 loss per share. (¶¶ 3, 51.)

- MicroStrategy reported, for the year ended December 31, 1999, that its revenues were $205.3 million, a 93% increase from 1998 revenues of $106.4 million, and that its net income was $12.6 million, or $0.29 per share on a diluted basis ($0.15 per share on a 2–for–1 stock split adjusted basis)—as compared to $6.2 million, or $0.16 per share on a diluted basis for 1998 ($0.08 per share on a 2–for–1 stock split adjusted basis). Earnings later were restated to reflect a net loss of $33.7 million, or a $0.44 loss per share on a 2–for–1 stock split adjusted basis. (¶¶ 3, 51.)

During the Class Period, MicroStrategy engaged PwC, an accounting firm, to provide independent auditing and accounting services. (¶ 24.) The Complaint alleges that PwC's participation was crucial to the creation of all of MicroStrategy's filings. Specifically, PwC allegedly worked closely with MicroStrategy to produce its quarterly financial reports and issued unqualified audit reports on the Company's 1997, 1998, and 1999 year-end financial statements, opining that those statements—pursuant to audits it purportedly conducted in accordance with Generally Accepted Auditing Standards ("GAAS")[7]—conformed with GAAP and fairly represented MicroStrategy's financial position. (¶¶ 7, 24, 27, 41, 43, 52, 128–130.) In fact, the Complaint alleges, the reports violated GAAP and PwC's audits of these reports violated GAAS. (¶¶ 131–35.)

The Complaint alleges that, during the Class Period, PwC also served as MicroStrategy's partner in marketing and installing software systems, assisting the Com-

---

**7.** Generally Accepted Auditing Standards are the procedures, rules, and conventions that define the conduct of auditors in performing and reporting on audits. (¶ 133.)

pany in at least 24 deals. (¶ 146.) This arrangement, the Complaint alleges, allowed PwC to collect fees from licenses it sold to customers and from consulting services it provided:

> Not only did PWC act as a reseller of MicroStrategy products, at a profit, but in many other instances, PWC acted as a marketer for MicroStrategy, encouraging clients to purchase MicroStrategy products such as its "Electronic Customer Relationship Management System" ("eCRM"), and then worked with the clients and MicroStrategy as a systems integrator, receiving substantial consulting fees as a result.

(¶¶ 8, 145, 146.)

The MicroStrategy Defendants and PwC have filed respective motions to dismiss the Complaint, pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state claims under Section 10(b) (and Rule 10b–5 promulgated thereunder), Section 20(a), and Section 20A of the Exchange Act upon which relief could be granted. Specifically, the MicroStrategy Defendants move: (i) to dismiss Plaintiffs' claim under Section 10(b) and Rule 10b–5 for failure to comply with the scienter pleading requirements of the PSLRA; (ii) to dismiss the same claim for failure to plead materiality; (iii) to dismiss Plaintiffs' claim under Section 20(a) of the Exchange Act for failure to allege a primary violation of the securities laws, to allege that Defendants Saylor, Bansal, Lynch, and Trundle are "control persons," and to allege that these Defendants culpably participated in any violation; and (iv) to dismiss Plaintiffs' claim under Section 20A of the Exchange Act for failure adequately to allege a primary violation of the securities laws, to allege contemporaneous trades by Named Plaintiff Vera Schwartz and Defendants Ingari and Trundle, and to allege that a damages remedy is available under Section 20A. PwC moves to dismiss Plaintiffs' Section 10(b) and Rule 10b–5 claim for failure to comply with the scienter pleading requirements of the PSLRA.

The issues raised by Defendants' motions are each considered in the following order. First considered are the respective motions of the MicroStrategy Defendants and PwC to dismiss Plaintiffs' Section 10(b) and Rule 10b–5 claims for failure to meet the heightened scienter pleading requirements of the PSLRA, followed by the MicroStrategy Defendants' materiality argument for dismissal. Next is the motion to dismiss Count II of the Complaint for failure to state a claim for control group liability under Section 20(a) of the Exchange Act. Finally taken up is the motion to dismiss Count III of the Complaint for failure to state a claim for secondary insider trading liability under Section 20A of the Exchange Act.

## II. APPLICABLE RULES AND PRINCIPLES

### A. Motions to Dismiss

In considering a motion to dismiss a complaint for "fail[ing] to state a claim upon which relief can be granted," a court must construe the complaint in the light most favorable to the plaintiffs, read the complaint as a whole, and take the facts asserted therein as true. Fed.R.Civ.P. 12(b)(6); *see Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Higgins v. Medical College,* 849 F.Supp. 1113, 1117 (E.D.Va.1994). All reasonable inferences must be made in favor of the nonmoving party, and "a count should be dismissed only where it appears beyond a reasonable doubt that recovery would be impossible under any set of facts which could be proven." *America Online, Inc. v. GreatDeals.Net,* 49 F.Supp.2d 851, 854 (E.D.Va.1999) (citing *Republican Party of N.C. v. Martin,* 980 F.2d 943, 952 (4th Cir.1992)); *see Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). A motion to dismiss tests only "the sufficiency of the complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses," *Republican Party,* 980 F.2d at 952, and a motion to dismiss should not be granted unless the court "could not grant relief under any set of facts that the plaintiff could prove consistent with his allegations in the complaint," *Carter Machinery Co., Inc., v.*

*Gonzalez,* No. 97–0332–R, 1998 WL 1281295, at *2, 1998 U.S.Dist. LEXIS 8106, at *5 (W.D.Va.1998) (citing *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)).

## B. The Scienter Pleading Standard of the PSLRA

■ To establish liability under Section 10(b) of the Exchange Act and under Rule 10b–5, a plaintiff must allege that "(1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages." [8] *Phillips v. LCI Int'l, Inc.,* 190 F.3d 609, 613 (4th Cir.1999); *accord Hillson Partners Ltd. Partnership v. Adage, Inc.,* 42 F.3d 204, 208 (4th Cir.1994); *Malone v. Microdyne Corp.,* 26 F.3d 471, 476 (4th Cir.1994). Because such claims necessarily involve allegations of fraud, a plaintiff must meet the requirement of Rule 9(b) of the Federal Rules of Civil Procedure that "the circumstances constituting fraud . . . be stated with particularity" in the complaint. Fed.R.Civ.P. 9(b). The PSLRA further requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all the facts on which that belief is formed." 15 U.S.C. § 78u–4(b); *see In re Criimi Mae, Inc. Sec. Litig.,* 94 F.Supp.2d 652, 657 (D.Md. 2000) ("Particularity of pleading is required with regard to the time, place, speaker and contents of the allegedly false statements, as well as the manner in which the statements are false and the specific facts raising an inference of fraud."). Finally, the PSLRA requires a plaintiff in a securities fraud case to "state with particularity facts giving rise to a *strong inference* that defendant acted with the required state of mind" in the complaint. 15 U.S.C. § 78u–4(b)(2) (emphasis added). A complaint that fails to comply with these requirements must—on any defendant's motion—be dismissed. *See* 15 U.S.C. § 78u–4(b)(3)(A).

The PSLRA itself does not define what pleaded facts are sufficient to give rise to a "strong inference" of scienter, and the Fourth Circuit has not yet decided the issue.[9] Since the passage of the PSLRA, courts addressing the "strong inference" requirement have split generally into three groups, each interpreting the "strong inference" standard differently.[10] Approximately half of the courts to address the "strong inference" standard—including the

---

**8.** Section 10(b) states, in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

15 U.S.C. § 78j(b). Rule 10b–5, in turn, specifies that the statute proscribes "mak[ing] any untrue statement of material fact or . . . omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5.

**9.** *See Phillips,* 190 F.3d at 621 (noting that "[w]e have not yet determined which pleading standard best effectuates Congress's intent," but declining to do so "because the [plaintiffs] have failed to allege facts sufficient to meet even the most lenient standard possible under the PSLRA, the two-pronged Second Circuit test").

**10.** *See* Michael B. Dunn, Note, *Pleading Scienter after the Private Securities Litigation Reform Act: Or, A Textualist Revenge,* 84 Cornell L.Rev. 193, 197–98 (1998) (collecting cases); Matthew Roskoski, Note, *A Case-by-Case Approach to Pleading Scienter under the Private Securities Litigation Reform Act of 1995,* 97 Mich.L.Rev. 2265, 2269–71 (1999) (same).

Second, Third, and Fifth Circuits—have held that the PSLRA incorporates the Second Circuit's pre-PSLRA jurisprudence, which not only established the "strong inference standard," but also promulgated two tests that, if met, would *per se* raise a "strong inference" of scienter.[11] Specifically, these courts have held that, as was true in the Second Circuit before the passage of the PSLRA, a plaintiff may plead a "strong inference" of scienter by proceeding under one of two approaches: "The first approach is to allege facts establishing the motive to commit fraud and an opportunity to do so. The second approach is to allege facts constituting circumstantial evidence of either reckless or conscious behavior." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268–69 (2d Cir.1993) (summarizing Second Circuit pre-PSLRA pleading tests); *see In re Carter–Wallace, Inc. Sec. Litig.*, 220 F.3d 36 (2d Cir.2000) (applying the same tests).[12] A second group of courts—including the First, Sixth, and Eleventh Circuits—has interpreted the PSLRA as incorporating the Second Circuit "strong inference" standard, but has held that allegations of motive and opportunity are *never enough* by themselves to create a "strong inference" of scienter.[13] Still another group of courts—chiefly the Ninth Circuit—similarly has interpreted the PSLRA to have borrowed the "strong inference" standard from the Second Circuit, but also has held that the PSLRA eliminated *both* the "motive and opportunity" test *and* nondeliberate recklessness as a possible substantive ground for securities fraud liability.[14] These courts have held that a plaintiff "must allege specific facts that constitute circumstantial evidence of conscious behavior by defendants" and cannot merely rest on allegations of motive and opportunity or nondeliberate recklessness.[15]

The task at hand is not to choose among these three lines of authority; indeed, none of the three approaches is wholly persuasive. Rather, the task at hand is one of statutory construction—namely, to construe the PSLRA and elucidate its heightened pleading requirement. To this end,

**11.** *Compare San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris*, 75 F.3d 801, 813 (2d Cir.1996) (outlining Second Circuit pre-PSLRA tests); *and In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 269 (2d Cir. 1993) (same); *with Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 537–38 (2d Cir. 1999) (dicta) ("The Private Securities Litigation Reform Act of 1995 heightened the requirement for pleading scienter to the level used by the Second Circuit . . . ."); *and In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir.1999) ("[I]t remains sufficient for plaintiffs [to] plead scienter by alleging facts establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior.") (internal quotation marks and citation omitted); *and Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir.1997) ("[T]he Act adopted the *same standard*" as the Second Circuit.).

**12.** *See also, e.g., Marksman Partners. v. Chantal Pharm. Corp.*, 927 F.Supp. 1297, 1308–12 (C.D.Cal.1996); *In re Health Management Inc. Sec. Litig.*, 970 F.Supp. 192, 200 (E.D.N.Y. 1997); *In re Wellcare Management Group Inc. Sec. Litig.*, 964 F.Supp. 632, 637 (N.D.N.Y. 1997).

**13.** *See, e.g., Greebel v. FTP Software, Inc.*, 194 F.3d 185, 197 (1st Cir.1999) ("[M]erely pleading motive and opportunity, regardless of the strength of the inferences to be drawn of scienter, is not enough."); *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 550–51 (6th Cir.1999) ("[P]laintiffs may plead scienter . . . by alleging facts giving rise to a strong inference of recklessness, but not by alleging facts merely establishing that a defendant had the motive and opportunity to commit securities fraud."); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1283 (11th Cir.1999) ("[W]e hold that the Reform Act does not prohibit the practice of alleging scienter by pleading facts that denote severe recklessness . . .; but we also hold that the Reform Act does not codify the 'motive and opportunity' test formulated by the Second Circuit.").

**14.** *See, e.g., In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir.1999) ("We hold that a private securities plaintiff proceeding under the PSLRA must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct.").

**15.** *See, e.g., Voit v. Wonderware Corp.*, 977 F.Supp. 363 (E.D.Pa.1997); *Powers v. Eichen*, 977 F.Supp. 1031 (S.D.Cal.1997).

the analysis properly begins with the text of the PSLRA, for "in any case of statutory construction, [the] analysis begins with 'the language of the statute.' And where the statutory language provides a clear answer, it ends there as well." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999) (quoting *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992)); *see also United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) ("[W]here ... the statute's language is plain, the sole function of the courts is to enforce it according to its terms.") (quotation omitted).[16] The PSLRA's text clearly and simply requires a court in a securities fraud case to determine if the allegations in the complaint raise a "strong inference" that the defendant acted with "the requisite state of mind" and on its face neither incorporates nor rejects formal *per se* tests for meeting this standard. Thus, the "strong inference" standard—unadorned by any judicially crafted *per se* tests—is the ultimate and sole threshold requirement for securities fraud plaintiffs to survive motions to dismiss for failure to plead scienter. And, it is the meaning of the phrase "strong inference," therefore, that must be ascertained. In this regard, the phrase must be

given its plain meaning, because "[i]n the absence of an indication to the contrary, words in a statute are assumed to bear their 'ordinary, contemporary, common meaning.'" *Walters v. Metropolitan Educ. Enters., Inc.*, 519 U.S. 202, 207, 117 S.Ct. 660, 136 L.Ed.2d 644 (1997) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Partnership*, 507 U.S. 380, 388, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993)).

An inference, by definition, results from "arriving at an opinion or coming to accept a probability on the basis of available evidence, which may be slight," or "attaining to a fact, truth, or belief after ordered consideration following through with necessary consequences of evidence weighed or facts observed."[17] That the PSLRA speaks of inferences is reasonable, if not necessary, given that "it is seldom if ever possible to prove the state of a defendant's mind by direct evidence," and that, accordingly, "finders of fact have almost always had to rely on circumstantial evidence to determine intent." *AUSA Life Ins. Co. v. Ernst & Young*, 991 F.Supp. 234, 247 (S.D.N.Y.1997). Thus, where a complaint does not allege facts directly showing that the defendant acted with the requisite state of mind, the court must take the factual allegations in the complaint and determine, through a deductive process, if it can be strongly inferred from them that

---

**16.** Many courts attempt to divine the meaning of "strong inference" from the PSLRA's legislative history, which on this point is inconclusive at best and contradictory at worst. *See, e.g., Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir.2000) ("[I]n our view, as is often the case with legislative history generally, the legislative history of the PSLRA contains conflicting expressions of legislative intent with respect to the pleading requirement.") (internal quotation marks omitted); *Greebel*, 194 F.3d at 195 ("The legislative history is inconclusive on whether the Act was meant to either embody or to reject the Second Circuit's pleading standards."); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 531, 533 (3d Cir.1999) ("The Reform Act's legislative history on this point is ambiguous and even contradictory.").

In the end, it is the text of the PSLRA that governs this issue, for what matters is not what Congress meant to say in passing the

PSLRA but what it in fact said. And where the text is unambiguous and its meaning is clear, resort to extraneous sources is unnecessary, if not improper. *See Director, Office of Workers' Compensation Programs, Dep't of Labor v. Greenwich Collieries*, 512 U.S. 267, 280, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994); *Shannon v. United States*, 512 U.S. 573, 579, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994); *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992); *Dowling v. United States*, 473 U.S. 207, 218, 105 S.Ct. 3127, 87 L.Ed.2d 152 (1985). On its face, the PSLRA plainly requires a court to assess the factual allegations of the complaint to determine if together they give rise to a "strong inference" of scienter—no more, no less.

**17.** Webster's Third New International Dictionary of the English Language Unabridged 1158 (1993).

the defendant acted with such a state of mind. This process involves essentially three steps. First, the reviewing court must identify the factual allegations that, taken as true, are *relevant* to proving (by inference or circumstantially) the defendant's state of mind. This is not the end of the endeavor, however, for it is also necessary to identify appropriate inferences from these alleged facts. The difficult second task is to assign *probative weight* to each fact and inference as it relates to proving state of mind. This is done by an appeal to logic, common sense, and human experience. The enterprise, moreover, entails a holistic examination of the interactions among all facts, for it is by examining how these facts combine that a fact-finder ultimately assesses whether a particular state of mind has been established under the applicable standard of proof. As a result of this holistic analysis, otherwise-unremarkable facts may take on added significance when combined with each other, having what might be termed a synergistic effect on probative value. In other words, as the Supreme Court has noted, it is a "simple fact of evidentiary life" that "individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts." *Bourjaily v. United States*, 483 U.S. 171, 179–80, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). The third step, then, is to determine whether, in the light of logic, common sense, and human experience, these poten-

tially synergistic combinations of facts and inferences—what in the vernacular of the law is called "the totality of the circumstances"—raise a "strong inference" that a defendant acted with the requisite state of mind. In this regard, the final step is assessing whether this inference is "strong"—that is, whether it is "[p]ersuasive, effective, and cogent," [18] "compelling," or "capable of making a clear or deep impression ... on the mind." [19]

To recapitulate, on a motion to dismiss, a court applying the "strong inference" standard of the PSLRA must take the factual allegations in the complaint as true, draw whatever inferences regarding the defendant's state of mind are supported by these allegations, and determine whether these inferences individually or cumulatively provide a strong—or "persuasive" and "cogent"—inference that the defendant possessed the requisite state of mind. In doing so, a court should not consider each relevant factual allegation solely in isolation—though some allegations by themselves may suffice to raise a strong inference of the requisite state of mind— but rather, as a part of the overall factual picture painted by the complaint. If the totality of the circumstances alleged raises a "strong inference" of the requisite state of mind, it is immaterial whether plaintiffs satisfy their burden by "pleading motive and opportunity, conscious misbehavior, recklessness, or by impressing upon the Court a novel legal theory." *In re Health Mgmt., Inc. Sec. Litig.*, 970 F.Supp. 192, 201 (E.D.N.Y.1997).[20]

**18.** Webster's II New Riverside University Dictionary 1149 (1984).

**19.** Webster's Third New International Dictionary of the English Language Unabridged 2265 (1993).

**20.** *See e.g., Angres,* 94 F.Supp.2d at 1174 ("[I]n those cases where motive and opportunity allegations do not alone create a strong inference of scienter, the allegations will nonetheless be relevant in determining whether the totality of allegations permits a strong inference of fraud."); *Schaffer v. Evolving Sys., Inc.,* 29 F.Supp.2d 1213, 1225 (D.Colo. 1998) ("[T]his Court assumes that the Reform

Act requires that 'a court examine a plaintiff's allegations in their entirety, without regard to whether those allegations fall within a formalistic category such as motive and opportunity, to determine if the allegations permit a strong inference of fraudulent intent.' "); *Robertson v. Strassner,* 32 F.Supp.2d 443, 447 (S.D.Tex. 1998) ("Plaintiffs may meet the heightened pleading requirements ... by 'alleging either motive and opportunity to commit fraud, or by pleading facts which identify circumstances indicating Defendants' conscious or reckless behavior, so long as the totality of the allegations raises a strong inference of fraudulent intent.' ") (quoting *Zuckerman v. Foxmeyer Health Corp.,* 4 F.Supp.2d. 618, 621

■ Finally, as the inference required by the PSLRA relates to the "requisite state of mind," it is important to be clear as to what is meant by this phrase. Importantly, the PSLRA, on its face, does not purport to change the pre-PSLRA substantive state of mind requirement for securities fraud liability. As one court put it, "Section 21D(b)(2) [of the PSLRA] is a provision addressing only pleading standards; nothing in the language of that provision purports to alter bases for substantive liability." *Malin v. Ivax Corp.*, 17 F.Supp.2d 1345, 1357 (S.D.Fla.1998).[21] Indeed, although the Fourth Circuit has not yet decided which approach—if any—is appropriate under the PSLRA's "strong inference" standard, it has noted that "[t]he PSLRA did not change the standard of proof a plaintiff must meet or the kind of

(N.D.Tex.1998)); *Queen Uno Ltd. Partnership v. Coeur D'Alene Mines Corp.*, 2 F.Supp.2d 1345, 1359 (D.Colo.1998) ("In short, the Reform Act requires that a court examine a plaintiff's allegations in their entirety, without regard to whether those allegations fall within a formalistic category such as motive and opportunity, to determine if the allegations permit a strong inference of fraudulent intent."); *In re Baesa Sec. Litig.*, 969 F.Supp. 238, 242 (S.D.N.Y.1997) ("The conclusion follows from the plain language of the statute that the mere pleading of motive and opportunity does not, of itself, automatically suffice to raise a strong inference of scienter. This, of course, does not mean that particulars regarding motive and opportunity may not be relevant to pleading circumstances from which a strong inference of fraudulent scienter may be inferred. In some cases, they may even be sufficient by themselves to do so. But, under the Reform Act, and in contrast to prior Second Circuit precedent, they are not presumed sufficient to do so. Rather, under the Reform Act formulation, the pleadings must set forth sufficient particulars, of whatever kind, to raise a strong inference of the required scienter.").

21. *See, e.g., In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 550 (6th Cir.1999) ("By its own terms, the PSLRA pleading standard does not purport to change the substantive law of scienter, or the required state of mind, for securities fraud actions.... The PSLRA did not disturb the well-settled understanding that 'scienter' is the requisite mental state for liability under § 10b or Rule 10b–5 cases.")

evidence a plaintiff must adduce to demonstrate scienter at trial in a securities fraud case." *Phillips*, 190 F.3d at 620. It is clear, therefore, that the substantive state-of-mind standard for securities fraud liability was unaffected by the PSLRA's passage, for the Act merely establishes a uniform rule as to the procedural sufficiency of pleadings in private securities fraud cases and requires that a plaintiff allege enough facts to raise a "strong inference" that the defendant possessed the "requisite" state of mind, as has been defined by the courts independent of the PSLRA.[22] In this regard, it is necessary to inquire into the "state of mind" that the Exchange Act requires, for only then can it be determined whether a complaint complies with the PSLRA—namely, whether the facts the complaint alleges collectively raise a "strong inference" that this requirement is met.[23]

22. *See, e.g., Greebel v. FTP Software, Inc.*, 194 F.3d 185, 200 (1st Cir.1999) ("We agree with those courts that hold that the PSLRA did not address the substantive definition of scienter."). It is also illuminating in this regard that while the PSLRA itself alters the substantive mental state requirements for the "safe harbor" provision for forward-looking statements and for joint and several liability, it merely raises the pleading standard to a "strong inference" of the *"requisite* state of mind" and does not otherwise refer to the substantive state-of-mind requirement in fraud cases. *See* 15 U.S.C. § 78u–5(c)(1)(B) (requiring proof of actual knowledge of falsity in establishing liability for forward-looking statements); 15 U.S.C. 78u–4(g)(2)(A) (imposing joint and several liability only on defendants who knowingly violated securities laws); *see also, e.g., Queen Uno*, 2 F.Supp.2d at 1356 ("That Congress explicitly altered the scienter requirement to exclude reckless conduct in § 78u–5(c) and did not explicitly do so in § 78u–4(b) suggests, at the least, that Congress did not intend to abolish recklessness as a state of mind sufficient to satisfy 10b–5's scienter requirement."). Indeed, it would have been anomalous for Congress to have imposed a higher substantive burden on plaintiffs at the pleading stage before discovery than they would bear on summary judgment or at trial after discovery.

23. *Cf. In re Baesa*, 969 F.Supp. at 240 ("Since the Reform Act nowhere defines what the 'required state of mind' is for any of the kinds of actions that might be brought under this

■] On defining the contours of the required state of mind for securities fraud liability, courts have long followed the Supreme Court's holding that scienter, or "a mental state embracing intent to deceive, manipulate, or defraud," is required. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). And, although the Supreme Court left open the question of whether recklessness suffices for scienter and securities fraud liability, every circuit to consider the question prior to the PSLRA's passage had held that recklessness suffices to establish liability.[24] Courts in this circuit have joined those in other circuits and have long endorsed recklessness as a substantive basis for scienter.[25] A finding of recklessness, however, must be based on "an act 'so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Phillips*, 190 F.3d at 621 (quoting *Hoffman v. Estabrook &*

*Co.*, 587 F.2d 509, 517 (1st Cir.1978)). Thus, it is settled that "'[r]eckless' in this context is viewed as a lesser form of intent, rather than merely a greater degree of ordinary negligence," and that simple negligence will not suffice. *In re Criimi Mae*, 94 F.Supp.2d at 660; *see, e.g., In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 550 n. 7 (6th Cir.1999); *In re CIENA Corp. Sec. Litig.*, No. Civ. A. JFM–98–2946, 2000 WL 683810, at *6 (D.Md. May 15, 2000). In any event, these considerations compel the conclusion that recklessness suffices as a substantive basis for securities fraud liability under Section 10(b), as amended by the PSLRA, and Rule 10b–5.

■ To recapitulate briefly, the proper application of the PSLRA's new heightened pleading requirements requires a court, on a threshold dismissal motion, to assess the totality of the circumstances as alleged in the complaint and determine if those alleged circumstances support a strong—*i.e.*, cogent and persuasive—inference that a defendant acted intentionally,

title, the definition must necessarily be found either elsewhere in the Exchange Act itself or (if the action is judicially implied) in the existing case law.").

24. *See, e.g., SEC v. Gotchey*, No. 91–1855, 1992 WL 385284, at *8 n. 23 (4th Cir. Dec. 28, 1992) (unpublished per curiam opinion) (holding that "severe recklessness satisfies scienter requirement" (citation omitted)); *SEC v. Steadman*, 967 F.2d 636, 641 (D.C.Cir. 1992); *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569–70 (9th Cir.1990); *In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1244 (3d Cir.1989); *Van Dyke v. Coburn Enter. Inc.*, 873 F.2d 1094, 1100 (8th Cir.1989); *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir.1989); *Hackbart v. Holmes*, 675 F.2d 1114, 1117–18 (10th Cir.1982); *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961–62 (5th Cir.1981) (en banc); *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1023–24 (6th Cir.1979); *Cook v. Avien, Inc.*, 573 F.2d 685, 692 (1st Cir.1978); *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 46 (2d Cir.1978); *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1044 (7th Cir.1977).

25. *See, e.g., Phillips*, 190 F.3d at 620 ("[T]o establish scienter, a plaintiff must still prove

that the defendant acted intentionally, which may perhaps be shown by recklessness."); *In re Orbital Sciences Corp. Sec. Litig.*, 58 F.Supp.2d 682, 685 (E.D.Va.1999) ("The element of scienter requires the Plaintiffs to allege that the Defendants acted recklessly or with the intent to deceive, manipulate, or defraud...."); *In re EPIC Mortgage Ins. Litig.*, 701 F.Supp. 1192, 1250 (E.D.Va.1988) (observing that recklessness has been a sufficient ground for scienter), *aff'd in part, rev'd in part on other grounds sub nom. Foremost Guar. Corp. v. Meritor Sav. Bank*, 910 F.2d 118 (4th Cir.1990); *In re FAC Realty Sec. Litig.*, 990 F.Supp. 416, 420 (E.D.N.C.1997) ("[T]he defendant must have acted knowingly or recklessly with respect to the truth or falsity of the statements in question."); *see also Malone v. Microdyne Corp.*, 26 F.3d 471, 479 n. 9 (4th Cir.1994) (noting that "[m]ost circuits have held that recklessness also may satisfy the scienter requirement"); *In re Hughes Creek, Inc.*, No. 91–1831, 1992 WL 301956, at *8 n. 23 (4th Cir. Oct. 21, 1992) (unpublished opinion) ("We note, however, that in some cases '[s]evere recklessness can satisfy the scienter requirement in an aiding and abetting case, at least where the alleged aider and abettor owes a duty to the defrauded party.'") (alteration in the original).

consciously, or recklessly. This approach rejects the Second Circuit's formalistic, pre-PSLRA *per se* "motive and opportunity" test, as the text of the Act says nothing about formal *per se* tests; on the other hand, it does not preclude consideration of motive and opportunity in the ultimate determination of whether the complaint, as a whole, raises a "strong inference" of the requisite fraudulent intent, as it remains unmodified by the PSLRA.[26] Thus, allegations of motive and opportunity are relevant, though not necessarily sufficient, to establishing a strong inference of scienter. In the end, however, the task at hand is to determine whether the allegations in a complaint, when taken collectively, raise a cogent and persuasive—*i.e.*, strong—inference that the defendant acted intentionally, consciously, or recklessly.

## III. SECTION 10(B) AND RULE 10B-5
### A. Scienter
### 1. Count I: MicroStrategy Defendants[27]

The Complaint's scienter allegations against the MicroStrategy Defendants are founded on the following alleged facts: (1) MicroStrategy's acknowledgment of the need to restate its financials to comply with GAAP, in light of (a) the magnitude and pervasiveness of the restated financial reports, (b) the simplicity of the accounting principles violated in this case, and (c) the importance of the contracts involved (¶¶ 98–99, 103–06); (2) statements made by Defendant Saylor in various interviews published in newspapers and magazines (¶¶ 100–02); (3) actions taken and statements made by the Defendants in connection with the Company's March 20, 2000, restatement announcement (¶¶ 59–60, 107); and (4) Defendants' motivation and opportunity (a) to meet Wall Street estimates,

(b) to portray the Company favorably to creditors, and (c) to profit from insider sales and other offerings (¶¶ 108–10). The task at hand, therefore, is to determine whether these allegations, individually or collectively, give rise to a "strong inference" of scienter.

### a. MicroStrategy's GAAP Violations and Restatement of Financials

The Complaint first alleges that, because GAAP requires a restatement of previously reported financials only when the facts that necessitated the restatement were in existence at the time the financials originally were issued,

> [b]y acknowledging the need to restate prior financials, defendants have effectively admitted that the Company's improper recognition of revenue was therefore known or recklessly disregarded at the time all of the foregoing fraudulent financial statements were originally released, and that the originally issued financial statements were materially misleading.

(¶ 98.) In this regard, the Complaint further details numerous specific GAAP violations that Defendants committed by virtue of their allegedly improper recognition practices. (¶¶ 67–69, 71.) For example, the Complaint alleges that Defendants' accounting practices ran counter to APB Opinion No. 28, which states that "[r]evenue from products sold or services rendered shall be recognized as earned during an interim period on the same basis as followed for the full year." (¶ 67.) And, the Complaint specifically points to three contracts to which MicroStrategy misapplied GAAP principles. (¶¶ 72–80.)

To begin with, the fact that a restatement of financials occurred is not suf-

---

**26.** It bears noting that the Second Circuit itself appears recently to have adopted this holistic, case-by-case approach in *Novak v. Kasaks*, 216 F.3d 300 (2d Cir.2000), where it concluded that "Congress's failure to include language about motive and opportunity suggests that we need not be wedded to these concepts in articulating the prevailing standard." *Id.* at 311. Accordingly, it admon-

ished that "litigants and lower courts need and should not employ or rely on magic words such as 'motive and opportunity.' " *Id.*

**27.** For purposes of this Section, which addresses the motion to dismiss of the MicroStrategy Defendants, the term "Defendants" refers only to the MicroStrategy Defendants collectively (and not also to PwC).

ficient to raise a strong inference of scienter, for it is settled that "scienter requires more than a misapplication of accounting principles,"[28] and "[m]ere allegations that statements made in one report should have been made in earlier reports do not make out a claim of securities fraud."[29] This general rule states the sensible and otherwise unremarkable proposition that the inferences that may be drawn for or against scienter from the mere fact that a company misapplied GAAP and accordingly had to restate its financials are in equipoise, and, therefore, that such allegations by themselves cannot give rise to a "strong inference" of scienter.

But this is not to say that a misapplication of accounting principles or a restatement of financials can never take on significant inferential weight in the scienter calculus; to the contrary, when the number, size, timing, nature, frequency, and context of the misapplication or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter (or, conversely, in favor of a nonculpable state of mind). Nor does the

rule stand for the proposition that scienter cannot be inferred *at all* from such allegations and that the allegations are, therefore, *irrelevant* to the issue of scienter. Such a proposition ignores the value of relevant circumstantial evidence as it relates to a defendant's state of mind. To put it differently, while it is true that it cannot be *strongly* inferred from bare allegations of a GAAP violation or a restatement of financials that a defendant acted recklessly, consciously, or intentionally, it is not true that *nothing* can be inferred from those facts at all or that "[s]pecific attributes of a GAAP violation may give rise to a stronger, or weaker, inference of scienter."[30] The mere *fact* that there was a restatement or a violation of GAAP, by itself, cannot give rise to a strong inference of scienter; the *nature* of such a restatement or violation, however, may ultimately do so.

Thus, were the misapplication of GAAP and the acknowledged need to restate MicroStrategy's financials the only factual allegations in the Complaint pointing to scienter, the Complaint would fail, for, as shown above, these allegations are not, by

---

**28.** *In re Orbital Sciences Corp. Sec. Litig.*, 58 F.Supp.2d 682, 687 (E.D.Va.1999); *see, e.g., Chill v. General Electric Co.*, 101 F.3d 263, 270 (2d Cir.1996); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir.1994); *In re Peritus Software Servs., Inc. Sec. Litig.*, 52 F.Supp.2d 211, 223 (D.Mass.1999) (noting that "[a] host of courts have held that a mere failure to recognize revenue in accordance with GAAP does not, in itself, suffice to establish scienter.").

**29.** *In re Comshare*, 183 F.3d at 553 (internal quotation marks omitted, alteration in original).

**30.** *In re The Baan Co. Sec. Litig.*, 103 F.Supp.2d 1, 21 (D.D.C.2000); *see, e.g., Chalverus v. Pegasystems, Inc.*, 59 F.Supp.2d 226, 233–36 (D.Mass.1999) (holding that the fact that the company violated GAAP, when viewed in light of "significant overstatements of revenue" tended to support inference of scienter); *cf., e.g., In re Comshare*, 183 F.3d at 553 ("The failure to follow GAAP is, *by itself,* insufficient to state a securities fraud claim.") (emphasis added); *In re Worlds of Wonder*, 35 F.3d at 1426 ("The *mere* publication of inaccurate accounting figures, or a failure to fol-

low GAAP, *without more,* does not establish scienter.") (emphasis added and quotation omitted); *Goldberg v. Household Bank*, 890 F.2d 965, 967 (7th Cir.1989) (affirming grant of summary judgment because "[w]e do not have facts that cry out fraud unless explained; we have a common situation, the aftermath of negligence at most *unless the investor knows something casting it in a more sinister light* ") (emphasis added); *In re Peritus*, 52 F.Supp.2d at 223 ("Thus, the mere fact that [defendant] voluntarily restated income in late 1998 does not, *standing alone,* support a 'strong inference' that [defendant] knowingly or recklessly misreported income.... Instead, the Court must ask whether the GAAP violations, *combined with other circumstances indicative of fraudulent intent,* raise a strong inference that the defendants knowingly or recklessly misled investors.") (emphasis added); *In re Orbital*, 58 F.Supp.2d at 687 ("The *mere fact* that [defendant] discovered a violation of [GAAP] in its financial statements *would not necessarily mean* that it recklessly or intentionally committed those violations in the first place.") (emphasis added).

themselves, sufficient to satisfy Plaintiffs' PSLRA pleading burden. In this case, however, the Complaint goes well beyond merely alleging that MicroStrategy misapplied accounting principles and that, consequently, the Company had to restate its financials. It does so by alleging in some detail the magnitude of the restated financials and the pervasiveness and repetitiveness of MicroStrategy's GAAP violations; the simplicity of the accounting principles violated in this case; and the importance of the contracts involved. This contextual background serves to amplify the inference of scienter to be drawn from MicroStrategy's GAAP violations and restatement of financials.

■ According to the Complaint, by violating GAAP, MicroStrategy, in SEC filings and registration statements and other public statements, was able falsely to report for fiscal years 1997, 1998, and 1999 and for seven of eight interim quarters in 1998 and 1999 that the Company operated at a profit, when, in fact, it operated at a loss.[31] By virtue of these violations, MicroStrategy reported aggregate "record" net income of $18.9 million for 1997, 1998, and 1999, when, in fact, the Company incurred a net loss for those years of more than $36 million. (¶¶ 3, 99.) In addition, the Company overstated its revenues over the same period by a total of $66 million. (¶ 3.) The magnitude of these misstatements are, as Plaintiffs contend, "breath-

taking" and plainly lend inferential weight to the bare facts that MicroStrategy violated GAAP and consequently had to restate its financials for those years.

In this regard, a number of courts have held that "significant overstatements of revenue 'tend to support the conclusion that defendants acted with scienter.'" *Chalverus v. Pegasystems, Inc.*, 59 F.Supp.2d 226, 234 (D.Mass.1999) (quoting *Marksman Partners v. Chantal Pharm. Corp.*, 927 F.Supp. 1297, 1314 (C.D.Cal. 1996).) Put differently, "[w]hile alleging a misapplication of Generally Accepted Accounting Principles standing alone is insufficient, such allegation when combined with a drastic overstatement of financial results can give rise to a strong inference of scienter .... [and] the totality and magnitude of the ... accounting violations [may] constitute strong circumstantial evidence of reckless or conscious misbehavior." *Carley Capital Group v. Deloitte & Touche*, 27 F.Supp.2d 1324, 1339–40 (N.D.Ga.1998); *see also, e.g., In re Baan Co. Sec. Litig.*, 103.F.Supp.2d 1, 21 (D.D.C. 2000) ("[T]he magnitude of the [GAAP] error can play a role" in inferring scienter.). Indeed, common sense and logic dictate that the greater the magnitude of a restatement or violation of GAAP, the more likely it is that such a restatement or violation was made consciously or recklessly.[32] This, of course, is a matter of degree, but it cannot be gainsaid that some viola-

---

**31.** The chart attached to this Opinion as Appendix A also reflects the specific figures as outlined in the factual precis, *supra.*

**32.** *See, e.g., Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir.2000) (agreeing that the magnitude of write-offs involved "renders less credible" defendants' argument that they acted without scienter); *In re Ancor Communications, Inc.*, 22 F.Supp.2d 999, 1005 (D.Minn.1998) (finding support for a strong inference of conscious behavior from a company's substantial overstatements of revenues); *In re Employee Solutions Sec. Litig.*, No. CIV 97–545–PHX–RGS–OMP, 1998 WL 1031506at *4, 1998 U.S.Dist. LEXIS 16444, at *8 (D.Ariz. Sept. 29, 1998) ("[T]he alleged magnitude of defendants' failure to keep adequate reserves arguably shows reckless disregard for material misrepresentations in the financial state-

ments."); *In re First Merchants Acceptance Corp. Sec. Litig.*, No. 97–C–2715, 1998 WL 781118, at *10, 1998 U.S.Dist. LEXIS 17760, at *30–*31 (N.D.Ill. Nov. 4, 1998) ("Other circumstances suggesting fraudulent intent can include ... the magnitude of the fraud alleged."); *Marksman*, 927 F.Supp. at 1313–14 ("A violation of [GAAP] may be used to show that a company overstated its income, which may be used to show the scienter for a violation of Section 10(b) and Rule 10b–5 .... The fact that the allegedly overstated revenues constituted such a significant portion of [defendant's] total revenues ... tend[s] to support the conclusion that the defendants acted with scienter."); *cf. In re Grand Casinos, Inc. Sec. Litig.*, 988.F.Supp. 1273, 1284 (D.Minn. 1997) (nonrestatement case finding that "the enormous discrepancy between defendants'

tions of GAAP and some restatements of financials are so significant that they, at the very least, support the inference that conscious fraud or recklessness as to the danger of misleading the investing public was present. *Cf. In re Oxford Health Plans Inc. Sec. Litig.*, 51 F.Supp.2d 290, 294 (S.D.N.Y.1999) ("[P]laintiffs allege 'in your face facts,' that cry out, 'how could [defendants] not have known that the financial statements were false.'") (citation omitted).[33] In this case, the alleged GAAP violations and the subsequent restatements are of such a great magnitude—amounting to a night-and-day difference with regard to MicroStrategy's representations of profitability—as to compel an inference that fraud or recklessness was afoot.[34]

The Complaint also alleges that the GAAP rules and MicroStrategy accounting policies violated in this case are not complex, as they reduce, in essence, to the simple principle that "revenue cannot be recognized for unexecuted contracts and/or where there are significant obligations and/or contingencies relating to such contracts." (¶ 105–06.) Yet, the Company, in the face of GAAP and its own publicly acknowledged policy of not recognizing revenues from an arrangement until "evidence of the arrangement is provided ... by a contract signed by both parties," nevertheless recognized revenues from contracts before they were executed. (¶ 72.) MicroStrategy, moreover, failed to apply "contract accounting" principles and "percentage of completion" methodology to arrangements of which "significant production, modification, or customization of software" was an integral part, though

representations and what actually happened" supported a strong inference of scienter).

**33.** Thus, as the Northern District of Illinois observed in *Rehm v. Eagle Finance Corp.*, 954 F.Supp. 1246 (1997), violations of GAAP and subsequent restatements take on greater weight as the magnitude of the violations and restatements increases:

> The fact that ... alleged accounting violations led to a drastic overstatement of [defendants'] yearly earnings and that defendants were responsible for calculating and releasing the financial information tends to support the conclusion that the defendants acted with scienter.
>
> Additionally, that defendants had to record a massive [restatement] weighs heavily in favor of a finding of reckless disregard. While it is true that the mere fact that a company's financial reporting was inaccurate does not establish scienter, the magnitude of reporting errors may lend weight to allegations of recklessness where defendants were in a position to detect errors. The more serious the error, the less believable are defendants' protests that they were completely unaware of [the company's] true financial status and the stronger is the inference that defendants must have known about the discrepancy.

*Id.* at 1255–56 (citations omitted).

**34.** Defendants rely on *In re In–Store Adver. Sec. Litig.*, 878 F.Supp. 645 (S.D.N.Y.1995), for the proposition that a court "cannot infer intent even from a 'serious departure' from GAAP that financial statements were prepared fraudulently, as '[s]uch an inference

would render meaningless the scienter requirement.'" Memorandum in Support of MicroStrategy Defendants' Motion to Dismiss Consolidated Amended Class Action Complaint, at 10 [hereinafter MicroStrategy Brief]. To the extent that the case involves facts that must be pled to state a claim against an auditor, it is of limited applicability to the MicroStrategy Defendants. In any event, that court's conclusion that a complaint that merely "allege[s] a serious departure from GAAS and GAAP .... does not ... suggest or otherwise give rise to *an* inference, let alone a strong inference, that [an auditor] recklessly disregarded the deviance or acted with gross indifference towards the purported material misrepresentations contained in the audited financial statements"—if taken to mean, as Defendants suggest, that the extent of a restatement based on GAAP allegations gives rise to *no inference at all* as to scienter—is unpersuasive as a matter of logic and precedent. *See, e.g., SEC v. Price Waterhouse*, 797 F.Supp. 1217, 1240 (S.D.N.Y.1992) (Where an audit is alleged to have been fraudulently made, it is sufficient to show "that the accounting practices were so deficient that the audit amounted to no audit at all, or [to] an egregious refusal to see the obvious, or to investigate the doubtful"). As discussed above, while a misapplication of GAAP may only support a weak inference of scienter (or an inference of equal strength to less culpable states of mind), it cannot be said that a misapplication of GAAP, in itself or when viewed in context, supports *no* inference of scienter whatever.

SOP 97–2, Plaintiffs contend, clearly so mandates. (¶¶ 77–78.)

The inference invited by the large magnitude of the misstated financials and the repetitiveness of the GAAP violations takes on added significance if, as the Complaint alleges, the violated GAAP rules and Company accounting policies are, in fact, relatively simple. This is so because violations of simple rules are obvious, and an inference of scienter becomes more probable as the violations become more obvious. Put another way, if the GAAP rules and MicroStrategy accounting policies Defendants are alleged to have violated are relatively simple, it is more likely that the Defendants were aware of the violations and consciously or intentionally implemented or supported them, or were reckless in this regard.[35] *See, e.g., In re Baan,* 103 F.Supp.2d at 21 ("[V]iolations involving the premature or inappropriate recognition of revenue suggest a conscious choice to recognize revenue in a manner alleged to be improper, and may therefore support a strong inference of scienter."); *Chalverus,* 59 F.Supp.2d at 234 ("Courts also have held that 'violation of a company's own policy supports an inference of scienter.'") (quoting *Provenz v. Miller,* 102 F.3d 1478, 1490 (9th Cir.1996)). To be sure, the application of accounting principles often involves details and minutiae, but the accounting principle violated here

boils down to the well-worn adage, "Don't count your chickens before they hatch." [36] These common-sense observations compel the conclusion that the alleged simplicity of the GAAP rules violated here are relevant and contribute probative weight to an inference of scienter.

Finally, the Complaint in some detail alleges that MicroStrategy, through improper revenue recognition practices, violated GAAP and its own accounting policies with respect to three of its most important contracts. First, Plaintiffs point to MicroStrategy's multimillion dollar contract with NCR Corporation ("NCR"). According to the Complaint, this contract was a significant factor in the Company's reported results for the third quarter of 1999—accounting for approximately 50% of MicroStrategy's reported license revenues for that quarter and for all of the revenue and earnings growth the Company purportedly saw for that quarter—and was characterized as a "watershed event" in MicroStrategy's history by analysts. A spokesperson and a vice-president from NCR, however, have stated that the agreement was not finalized until the fourth quarter of 1999 and that NCR had no "contractual rights" with respect to the transaction until the fourth quarter; accordingly, no revenues from the contract should have been recognized, if

---

35. Defendants attempt to avoid this conclusion by arguing that the real focus of this case is or should be over "contract accounting"—the accounting principle which spreads the recognition of revenues from contracts that involve significant production, modification, or customization over the entire contract period—and not "contract execution"—that is, MicroStrategy's recognition of revenues from contracts before the contracts were formally executed. To that end, Defendants devote a considerable portion of their reply brief to demonstrating that contract accounting principles are, in fact, complex. *See* Reply Memorandum in Support of MicroStrategy Defendants' Motion to Dismiss Consolidated Amended Class Action Complaint, at 11–15 [hereinafter MicroStrategy Reply Brief]. As discussed below in Section III.B, however, this argument is unpersuasive—if not inapposite—at this early stage in the proceedings.

36. Indeed, the force of Defendants' protestations that revenue recognition rules are complex is diminished—at least with respect to the contract execution issue—by the fact that PwC has published *The User–Friendly Guide to Understanding Software Revenue Recognition,* which, with pellucid clarity, states:

> If a signed arrangement has been entered into subsequent to the date of revenue recognition ... revenue was improperly recognized. Written contracts must be signed by both parties prior to revenue recognition. The signatures must be obtained as of the balance sheet date in order to include the transaction in a given period's revenues.

(¶ 144.) Thus, though the Complaint does not specifically allege that the MicroStrategy Defendants were in possession or were aware of this publication, it at least appears that the rules in some form are "user-friendly."

at all, until the fourth quarter (and not the third quarter) of 1999. MicroStrategy's early recognition of revenues from this transaction alone allowed MicroStrategy to report a profit of $0.09 per share, rather than the approximately $0.30 loss per share that it would have had had it followed GAAP. (¶¶ 5, 73.)

Second, the Complaint also points to contracts between MicroStrategy and Exchange Applications Inc. ("Exchange") and Primark, which collectively accounted for approximately 25% of the revenue that the Company reported for the fourth quarter of 1999. MicroStrategy allegedly improperly recognized approximately $14 million from the Exchange contract in the fourth quarter of 1999, when, in fact, the contract was not executed by both parties until after the fourth quarter and the fiscal year closed on December 31, 1999. In addition, the Company recognized at least $5 million in revenue from its arrangement with Primark in the fourth quarter of 1999 even though Primark did not report the contract as executed until the first quarter of 2000. But for these two instances of improper recognition of revenues, the Complaint alleges, MicroStrategy would have reported substantial losses for the quarter, instead of the $3.76 million in net income that the Company reported. (¶¶ 3, 74–76.)

It would strain credulity to conclude that no probative value at all attaches to MicroStrategy's failure to apply to three of the most important contracts in its corporate life the GAAP and Company policy that revenues from contracts should not be recognized until the contracts are executed. To the contrary, "[p]roblems with a transaction with a major impact on revenues are more likely to help support a strong evidence of scienter," and, here, the significance of the NCR, Exchange, and Primark contracts to MicroStrategy certainly makes less credible the inference that the Defendants were not aware of or did not recklessly disregard the accounting irregularities relating to these contracts. *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 206 n. 18 (1st Cir.1999); *see, e.g., In re Aetna Inc. Sec. Litig.,* 34 F.Supp.2d 935, 953–54 (E.D.Pa.1999) (finding a strong inference that defendants/officers had conscious knowledge of misrepresentations and omissions concerning financial impact and success of integration with acquired company from their high-level executive positions and the significance and importance of the acquisition); *Chalverus,* 59 F.Supp.2d at 228–29. Moreover, that these accounting irregularities involved contracts signed at or near the end of fiscal years and quarters further casts the suspicious nature of MicroStrategy's GAAP violations in bold relief, for "[d]rastic overstatements of revenue are particularly suspect when the transaction occurs at a suspicious time, such as the end of a fiscal quarter or year." *Chalverus,* 59 F.Supp.2d. at 234.

In sum, these further allegations shed light on otherwise inferentially ambiguous (though not barren) allegations that there were GAAP violations and restatements of financials. An analysis of MicroStrategy's GAAP violations and restatement of financials, when viewed in light of the magnitude of the overstatements, the nature of the accounting principles violated, and the importance of the contracts to which these principles were applied compels the conclusion that Plaintiffs, with these factual allegations, shift the balance of inferences to be drawn from MicroStrategy's GAAP violations and subsequent restatements in favor of scienter.[37] It is not necessary to determine whether such a shift is *strongly*

---

**37.** Accordingly, Defendants' heavy reliance on *In re Comshare* to support their claim that allegations of GAAP violations never contribute to an inference of scienter is misplaced, for that case is factually distinguishable. *See* MicroStrategy Brief, at 9–10. In *In re Comshare,* the plaintiffs, beyond pleading bare facts alleging motive and opportunity (which the court held insufficient to raise a strong inference of scienter), relied solely on speculative allegations that a parent company was aware of or recklessly ignored GAAP violations by a subsidiary and thereby failed to allege facts showing "that the revenue recognition errors at the heart of this case were 'so obvious that any reasonable man would have known of

in favor of scienter, however, as the Complaint contains yet additional factual allegations relevant to the inquiry that must, therefore, be considered.

### b. Statements by Michael Saylor

■ Plaintiffs also allege that statements made by Defendant Saylor in various interviews published in newspapers and magazines lend further weight to the inference that Defendants were aware of, or reckless as to, the improper accounting practices at issue. (¶¶ 100–02.) The Complaint excerpts an interview of Saylor with a reporter of the *Washington Post* in June 1999:

> "In the public world there's a difference between 11:59 and 12:01, the last day of March. There's a tangible difference," Saylor said. "One of them is, you go to jail if the thing gets signed at 12:01 . . . ." One of them is, the stock is up $500 million. And the other one is, you've just torched the life and livelihood of a thousand families.
>
> "Would you sacrifice a thousand people's lives for one minute of integrity, or would you, like, put the clock back?" It was a dilemma he now had to "deal with . . . every quarter," he said.

[them].' " *In re Comshare*, 183 F.3d at 553. As discussed above, however, in this case the Complaint contains, *inter alia*, other allegations that provide context to the GAAP violations and the restatements. Thus, unlike the complaint in *In re Comshare*, the Complaint in this case goes beyond a mere reliance on the *fact* that there were GAAP violations or a subsequent restatement of financials.

The parent-subsidiary situation in *In re Comshare* further limits the applicability of that case to this one. The Sixth Circuit reasonably viewed the parent-subsidiary relationship in that case already to have shifted the balance of inferences to be drawn from allegations of GAAP violations or restated financials *against* an inference of scienter on the parent company's part. *Id.* at 553 ("[T]his Court should not presume recklessness or intentional misconduct from a parent corporation's reliance on its subsidiary's internal controls."); *cf. In re Baan*, 103 F.Supp.2d at 21 (citing *Chill v. General Electric Co.*, 101 F.3d 263, 263 (2d Cir.1996)). Contrary to Defen-

(¶ 100.)[38] These statements, as Plaintiffs contend, are probative of a cavalier and manipulative attitude toward disclosure requirements on the part of the President and Chief Executive Officer of MicroStrategy, if not the Company and its officers and directors generally. These statements at the very least provide further context to MicroStrategy's revenue recognition practices and are, therefore, not without probative value. First, these statements were made by the Company's top officer and principal shareholder, and it is a fair inference to draw that these statements relate not only to Saylor's personal views, but also to his conduct of official duties at MicroStrategy and to accounting practices at the Company. Second, Saylor's statements are particularly probative, as they tend to show a particularized awareness of the importance of timing in accounting for contract revenues. Indeed, that Saylor chose to characterize the choice as one between "put[ting] the clock back" and "the stock is up $500 million," on the one hand, and "one minute of integrity" while "torch[ing] the life and livelihood of a thousand families" and "sacrific[ing] a thousand people's lives," on the other, provides a valuable insight into Saylor's state of mind.[39]

dants' claims, therefore, *In re Comshare* is *not* on point in this case.

**38.** Omitted from this quotation of the excerpt as included in the Complaint is a bracketed addition by Plaintiffs that read, " 'There's a tangible difference,' Saylor said. 'One of them is, you go to jail if the thing gets signed at 12:01 [and you book it the day before].' " Defendants take issue with the bracketed statement, "[and you book it the day before]," as being supplied by Plaintiffs and as not appearing in the article itself. It is clear, however, that the interview concerned MicroStrategy's revenue recognition practices, and that the alteration is consistent with, and indeed invited by, the quoted portion. Thus, Defendants' contention that the quote is *not at all probative* of any issue in this case is unpersuasive.

**39.** The Complaint also quotes the *Forbes* article that questioned MicroStrategy's revenue recognition practices, in which Saylor explained, "My job is to manage the business in such a way that *nobody's disappointed*. I

Saylor's statements, when combined with MicroStrategy's GAAP violations and restatements viewed in context, contribute significant weight to an inference of scienter in this case. Again, however, it is not necessary to assess the strength of these inferences at this juncture, for there is more—the Complaint contains additional factual allegations probative of scienter.

### c. The March 20, 2000, Restatement Announcement and Subsequent Correction

■ The Complaint further alleges that the actions taken and statements made by the Defendants in connection with the Company's March 20, 2000, restatement announcement further evidence their fraudulent intent. (¶¶ 59–60, 107.) Specifically, the Complaint alleges that in MicroStrategy's March 20, 2000, press release, in which it announced its intention to restate its financials, the Company attributed the restatement to a decision to "conform to the *most recent* statement of the Securities and Exchange Commission and the accounting profession regarding revenue recognition in the software industry" and focused on SEC Staff Accounting Bulletin 101, which was issued in December 1999. This statement, argue Plaintiffs, "gave the false impression that the restatement was due to recent changes in GAAP interpretations by the SEC, rather than the Company's and PWC's recent and purposeful (or, at the very least, reckless) violation of long-standing GAAP pronouncements." (¶ 59.) In addition, the

Complaint alleges that, prompted by the SEC to disclose the true reason for the restatements, MicroStrategy the following day "reversed itself and conceded in a press release that the restatements had been compelled by a need to conform with GAAP pronouncements *that had been in effect since 1997.*"[40] (¶ 60 (emphasis in original).)

These allegations, taken as true at this stage, are probative of scienter. A fair inference to be drawn from the fact that MicroStrategy originally cited a different—if not an outright false and misleading—reason for its need to restate its financials is that, faced with the public revelation of its irregular accounting practices, the Company was seeking to conceal a conscious or reckless practice of violating GAAP and falsely reporting financial figures. And, insofar as such attempts at covering-up the truth are probative of a culpable state of mind, MicroStrategy's contention that "any alleged mistakes in the press release's citations to accounting releases in explaining the restatement *cast no light* about what defendants knew at the time the original financial statements were issued" is simply unpersuasive.[41] Thus, these allegations further tip the balance of inferences regarding the Defendants' states of mind in favor of scienter.

### d. Motive and Opportunity

As discussed above, under the pre-PSLRA jurisprudence of the Second Cir-

---

have lots of levers at my disposal." (¶ 101.) Finally, Plaintiffs cite a profile that appeared in the *New Yorker* on April 3, 2000, wherein Saylor stated, "I think I'm on a mission from God, and if you don't buy from me we're all going to Hell," and allegedly indicated to the reporter that he "wanted to be Caesar." (¶ 102.)

The statements from these two interviews are much less revealing than the *Washington Post* statements quoted above and therefore contribute slight, if any, probative weight to the overall balance of inferences to be drawn from the Complaint.

**40.** The statement further explained:

MicroStrategy today clarifies these statements [made on March 20, 2000] as follows: The principal reason for the Company's decision to revise its 1998 and 1999 reported revenues and operating results was the need to do so under existing accounting principles articulated in Statement of Position 97–2. The Company's previously reported revenues and operating results were not revised principally to conform with Staff Accounting Bulletin 101 in advance of its required implementation by March 31, 2000.

(¶ 60.)

**41.** MicroStrategy Brief, at 11 n. 6.

cuit, allegations that a defendant had the motive and opportunity to commit securities fraud *per se* raised a strong inference of scienter.[42] Since the PSLRA's passage, courts have split on whether pleading motive and opportunity *per se* suffices to raise a strong inference of scienter. The better rule, however—the one compelled by the PSLRA's language—is that allegations of motive and opportunity are relevant, though not necessarily sufficient, to establishing a strong inference of scienter. This is so because these formalistic categories of "motive" and "opportunity" are insufficiently sophisticated to distinguish between (i) general motives and opportunities possessed by every officer and director—which, while relevant, are by themselves inferentially ambivalent and therefore not supportive of a strong inference of scienter—and (ii) specific motives and opportunities to commit fraud—which may contribute more significantly to such an inference. Indeed, that courts recognizing the *per se* "motive and opportunity" test find it necessary to qualify its application with the common-sense rule that "a *generalized* motive, one which could be imputed to any publicly-owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter," demonstrates that, ultimately, these formal categories are of little help. *Chill,* 101 F.3d at 268 (emphasis added). Thus, the task at hand is not to pigeonhole factual allegations in the Complaint into the discrete and isolated categories of "motive" and "opportunity," but rather to determine whether the relevant allegations of motive and opportunity in the Complaint are sufficiently concrete to contribute to a strong inference of scienter to be drawn from the totality of the circumstances.

It is doubtless true that key directors and officers have the ability to manipulate their company's stock price, and Defendants do not dispute that they had the opportunity to commit fraud in this case.[43] Plaintiffs allege in the Complaint that the Individual Defendants were among MicroStrategy's most senior executive officers charged with conducting the day-to-day affairs of the Company; that some of the Individual Defendants were also members of the board of directors' audit committee, which met periodically during the Class Period; and that the positions of the Individual Defendants provided them with direct access to confidential, nonpublic information concerning the Company, including, in particular, the Company's sales and accounting information. (¶¶ 20, 93, 111, 116–18.) The key question, therefore, is whether the Complaint pleads facts indicating a specific motive that is, in turn, more probative than not of scienter.[44]

■ There is no dispute that allegations pertaining to motivation that are applicable to every corporation or corporate

---

**42.** *See supra* notes 10–15 and accompanying text.

**43.** *See, e.g., Phillips,* 190 F.3d at 621; *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 813 (2d Cir.1996); *In re Time Warner,* 9 F.3d at 269; *Rehm v. Eagle Finance Corp.,* 954 F.Supp. 1246, 1253 (N.D.Ill.1997).

**44.** As is also the case with pleadings of GAAP violations or restatements of financials, however, it is not the case that such generalized allegations are *irrelevant* —that they are inferentially barren—or that other factual allegations cannot strengthen the inference of scienter to be drawn from them. But, in order to satisfy their pleading burden by pleading motive alone, securities fraud plaintiffs must plead additional facts going to motive that sufficiently strengthen any inferences of scienter and weaken other inferences of a nonculpable state of mind.

Even if the motive allegations in a complaint fail in themselves to meet the pleading burden, however, they may still be considered along with other allegations of direct or circumstantial facts in the ultimate determination of whether the totality of the circumstances raise a "strong inference" of scienter. To put it differently, "in those cases where motive and opportunity allegations do not alone create a strong inference of scienter, the allegations will nonetheless be relevant in determining whether the totality of allegations permits a strong inference of fraud." *Angres v. Smallworldwide PLC,* 94 F.Supp.2d 1167, 1174 (D.Colo.2000).

officer cannot, by themselves, raise a strong inference of scienter.[45] This is so because an inference based on a general motive shared by all corporate officers and directors is no more probative of scienter than of other less-culpable states of mind; therefore, "[t]o find such bare allegations sufficient ... would unfairly infer an intent to defraud based on the position an individual held with a company." *In re Stratosphere Corp. Sec. Litig.,* 1 F.Supp.2d 1096, 1116 (D.Nev.1998). But, a more particularized motive to commit fraud, one tied to specific circumstances, is not so inferentially ambiguous, and a showing of " 'concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged' " may provide the necessary added inferential weight to tilt the balance in favor of scienter. *Phillips,* 190 F.3d at 621 (quoting *Shields v. Citytrust Bancorp. Inc.,* 25 F.3d 1124, 1130 (2d Cir.1994) and *Zeid v. Kimberley,* 973 F.Supp. 910, 923 (N.D.Cal. 1997)). Thus, for example, allegations of insider trading may strengthen an inference of scienter where "the trades were unusual in their timing *or* amount." *In re Orbital Sciences Corp. Sec. Litig.,* 58 F.Supp.2d 682, 686 (E.D.Va.1999); *cf. Greebel,* 194 F.3d at 198 ("[M]ere pleading of insider trading, *without regard to either context or the strength of the inferences to be drawn,* is not enough.") (emphasis added).

In this case, the Complaint alleges that Defendants' opportunity and motivation (i) to profit from insider sales by the Individual Defendants, (ii) to meet Wall Street estimates and thereby profit from MicroStrategy's IPO and other secondary offerings, and (iii) to portray the Company favorably to creditors and to meet specific credit agreements with lenders in themselves raise, or with their other allegations contribute to raising, a strong inference of scienter. (¶¶ 108–10.) Whether these allegations succeed will be discussed in turn.

### i. Insider Sales

The Complaint alleges that the Individual Defendants were motivated to commit the alleged fraud because "they were able to handsomely benefit from the resulting inflation of MicroStrategy's stock price." Plaintiffs allege that the Individual Defendants "reaped over $90 million from sales of substantial portions of their holdings during the Class Period," and that the magnitude and timing of these sales of stock—independent of any sales in the context of an offering—by themselves raise a strong inference or are probative of scienter. (¶ 110.) *See Phillips,* 190 F.3d at 622 ("To support a claim of motive based on the benefit a defendant derives from an increase in the value of his holdings, a plaintiff must demonstrate some sale of 'personally-held stock' or 'insider trading' by the defendant.") (quoting *Marksman,* 927 F.Supp. at 1312).

It is settled that a "mere pleading of insider trading, without regard to either context or the strength of the inferences to be drawn, is not enough." *Greebel,* 194 F.3d at 198; *see Maldonado v. Dominguez,* 137 F.3d 1, 9–10 (1st Cir.1998). However, it is equally well-settled that "[s]ales of stock by corporate insiders can suffice to establish scienter if the trades were unusual in their timing or amount." *In re Orbital,* 58 F.Supp.2d at 686 (emphasis added); *see also In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1117 (9th Cir. 1989); *In re Comshare,* 183 F.3d at 553. In this regard, courts should not "infer fraudulent intent from the mere fact that some officers sold stock.... Instead, plaintiffs must allege that the trades were made at times and in quantities that were suspicious enough to support the necessary strong inference of scienter." *In re*

---

**45.** *See, e.g., Phillips,* 190 F.3d at 623; *Chill,* 101 F.3d at 268; *Novak v. Kasaks,* 216 F.3d 300 (2d Cir.2000); *Melder v. Morris,* 27 F.3d 1097, 1102 (5th Cir.1994) ("[P]laintiff's allegation of motive—basically that the defendant

and officers were motivated by incentive compensation—would effectively eliminate the state of mind requirement as to all corporate officers and defendants.").

*Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1424 (3d Cir.1997); *see, e.g., Greebel,* 194 F.3d at 197 ("Unusual trading or trading at suspicious times or in suspicious amounts by corporate insiders has long been recognized as probative of scienter."); *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 540 (3d Cir.1999); *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1224 (1st Cir.1996). Among the factors relevant to this inquiry are (i) whether the alleged trades were "normal and routine" for the insider; (ii) whether profits reaped "were substantial enough in relation to the compensation levels for any of the individual defendants so as to produce a suspicion that they might have had an incentive to commit fraud"; and, (iii) whether, in light of the insider's total stock holdings, the sales are unusual or suspicious. *In re Burlington Coat Factory,* 114 F.3d at 1423. With regard to the last factor, however, there is no bright line test as to the amount or percentage of stock that must be sold to constitute a "suspicious amount"—nor should there be, for, in the end, the determination of whether insider sales were "suspicious" is highly context-specific and dependent on the other allegations in the complaint.[46]

The Individual Defendants' stock sales, as alleged in the Complaint and reported in public records, are summarized in the following table:

| Defendant | Number of Shares Sold | Price Sold | Percentage of "A" Share Holdings | Percentage of Total Holdings | Period | Approximate Total Proceeds |
|---|---|---|---|---|---|---|
| Michael Saylor | 500,000 | $85–$86.09 | 100% | 2.2% | Oct. 27–29, 1999 | $42,587,700 |
| Sanju Bansal | 10,500 | $37.63–$38 | | | July 27–28, 1999 | $399,000 |
| | 330,000 | $85–$86.09 | 95% | 10.3% | Oct. 27–29, 1999 | $28,107,900 |
| | 22,000 | $94.15 | | | Nov. 19, 1999 | $2,071,300 |
| Mark Lynch | 11,000 | $37.50–$38 | 99% | 85.6% | Jul. 27–28, 1999 | $385,500 |
| | 50,000 | $85–$86.09 | | | Oct. 27–29, 1999 | $4,133,700 |
| Stephen Trundle | 2,000 | $30.50 | | | Aug. 17, 1999 | $61,000 |
| | 65,000 | $84–$88 | 31% | 35.6% | Oct. 25–27, 1999 | $5,475,000 |
| | 50,000 | $148.50–$150 | | | Feb. 29, 2000 | $7,459,200 |
| Ralph Terkowitz | 10,000 | $86.25–$86.69 | 91% | 50% | Oct. 28, 1999 | $843,900 |
| Frank Ingari | 10,000 | $90 | 50% | 51.8% | Oct. 22, 1999 | $875,000 |
| **TOTAL SHARES SOLD:** | **1,060,500** | | | | **TOTAL PROCEEDS:** | **$92,399,200** |

Plaintiffs allege that each of the private sales of stock by the Individual Defendants occurred within days after an announcement that the Company showed an "[*n*]th

**46.** *Compare Provenz,* 102 F.3d at 1491 (holding that 20% of individual defendant's holdings raised an inference of scienter); *and Schlagal v. Learning Tree Int'l,* No. CV 98–6384, 1998 U.S.Dist. LEXIS 20306, at *49 (C.D.Cal. Dec. 29, 1998) (holding that total proceeds from insider sales of $10.6 million raised inference of scienter); *and In re MTC Elec. Techs. Shareholders Litig.,* 898 F.Supp. 974, 980 n. 4 (E.D.N.Y.1995) (holding that stock sales by one defendant of approximately 8,000 shares for profit of $173,000 raised strong inference of fraudulent intent); *with In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 987 (9th Cir.1999) (holding that collective sales of 10% insufficient to raise strong inference of conscious fraud); *and Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 53 (2d Cir. 1995) (holding that sale by one defendant of 11% of holdings, in light of absence of any sales by other defendants, undermined allegations of scienter).

consecutive quarter of increased revenue," and that such sales, therefore, are suspicious and probative of scienter. The Complaint, for example, alleges that Defendants Bansal, Lynch, and Trundle made significant sales of Class A stock in July 1999, August 1999, November 1999, and/or February 2000, and that each of these sales occurred within days after an announcement by MicroStrategy of increased earnings and revenues. (¶¶ 110, 46, 47, 49, 51, 53.) In this respect, Plaintiffs focus on sales by all of the Individual Defendants of MicroStrategy Class A common stock between October 22 and 29, 1999—only several days after the issuance of the October 18, 1999, press release announcing the Company's inflated third quarter 1999 results and the (prematurely) claimed "$52.5 million relationship" with NCR. (¶¶ 5, 48.) Indeed, as the Table above reflects, all of the sales made by Defendants Saylor, Terkowitz, and Ingari (independent of any sales made in the context of an offering) during the Class Period occurred in this 8–day period alone and constituted approximately 100%, 91%, and 50%, respectively, of their holdings of Class A shares. These sales, according to the Plaintiffs, are suspicious both in their timing and amount (both in terms of the proceeds realized and the percentages sold of their respective holdings) and thus are probative of scienter.

Defendants take issue with Plaintiffs' focus on the Individual Defendants' holdings of Class A common stock and argue that an examination of these sales must take into account the percentage of each Individual Defendant's *total* holdings was sold. According to the Complaint, MicroStrategy has two classes of stock: Class A common stock, the owners of which are entitled to one vote per share and can sell shares without any restriction, and Class B common stock, the owners of which are entitled to ten votes per share but can only sell shares with the consent of the holders of the majority of Class B shares or by converting their Class B shares into Class A shares on a one-to-one basis. (¶ 20.b.) The Complaint further alleges facts indicating that Class B shares account for 69.3% of the Company's total shares of outstanding common stock, and that virtually all of such shares are held by the Company's senior executives, including the Individual Defendants. (¶¶ 20.b, 21.) Defendants argue that, when taken in the context of each Individual Defendant's total holdings of common stock, each sale hardly amounted to the "massive insider selling" that Plaintiffs allege. Specifically, Defendants contend that such a comparison shows that the Individual Defendants *collectively* sold less than 5% of their total holdings in the Company, and that, thus, the sales fall short of what is necessary to support an inference of fraudulent intent.[47]

Defendants are correct in their assertion that a more useful inquiry is the relationship between the individual sales and each Individual Defendant's total holdings.[48] *See In re Burlington Coat Factory,* 114 F.3d at 1423. This is so because, unlike Class A shares, Class B shares cannot be sold without first being converted to Class A shares; thus, sales of Class A shares by the Individual Defendants generally represent sales of Class B shares. A focus on Class A sales would appear unfairly to skew the analysis against the Individual Defendants, suggesting that the Individual Defendants sold a greater percentage of their trading potential than was actually the case. *See In re Silicon Graphics,* 183 F.3d at 987 ("Actual stock shares plus exercisable stock options represent the owner's trading potential more accurately than stock shares alone. Therefore, a sale involving a significant

---

47. *See* MicroStrategy Brief, at 15.

48. Defendants have supplied the Court with filings made by the Individual Defendants to the SEC that show, for the most part, that the Individual Defendants' holdings of Class A stock were converted from their holdings of Class B stock. See Exhibits Submitted in Support of MicroStrategy Defendants' Motion to Dismiss Consolidated Amended Class Action Complaint, at G.

portion of his shares and options combined, is less suspicious than were the insider to hold no options."). Even so, the alleged insider sales, when viewed within the totality of the circumstances, are probative of scienter. Four reasons support this conclusion.

First, even when considered in light of the Individual Defendants' total holdings of MicroStrategy shares, the sales clearly are significant. Although the sales in the aggregate amounted to less than 5% of all of the Individual Defendants' total holdings, this figure is itself somewhat misleading. Because this 5% figure represents the aggregated sales as a percentage of *all* of the Individual Defendants' aggregated holdings, it masks the fact that Defendants Bansal, Lynch, Trundle, Terkowitz, and Ingari respectively sold 10.3%, 85.6%, 35.6%, 50%, and 51.8% of their *total individual holdings* during the Class Period. These are manifestly significant percentages on an individual basis, a fact obscured by lumping together all sales and holdings.

Second, if such sales of Class A stock in fact represented (by conversion) the sale of Class B stock, then the sales give rise to a fair inference that the need to sell was so important that each of these Individual Defendants was willing to give up as much as 85.6% of their respective share of control of the Company. In this light, even Defendant Saylor's sale of 2.2% of his total holdings—which represents as much as 2.2% of his share of control of the Company—takes on added significance. Indeed, this inference is further amplified by the fact that holders of Class B shares enjoy a 10-to-1 advantage in voting over Class A shareholders and, accordingly, that the sale of Class B shares constitutes a significant dilution of the shareholder's voting power vis-a-vis Class A shareholders.[49]

Third, even if the aggregated sales as a percentage of the Individual Defendants' total holdings superficially appear unim-

pressive, they take on greater weight when the timing of the sales is taken into consideration. The Complaint alleges that *all* of Defendant Saylor's sales—though only amounting to 2.2% of his total holdings—and all of the sales made by Defendants Terkowitz and Ingari—representing 50% and 51.8% of their total holdings, respectively—during the 2-year Class Period occurred within a single 8-day period immediately following MicroStrategy's allegedly premature announcement of a "$52.5 million relationship" with NCR, termed by analysts as a "watershed event" in MicroStrategy's history, accounting for approximately 50% of the Company's license revenues reported and for all of the revenue and earnings growth the Company purportedly experienced for the quarter. (¶¶ 5, 48, 110.) Moreover, more than half of the sales of the remaining Individual Defendants during the Class Period occurred during this period: Defendant Bansal sold 91%, Defendant Lynch sold 82%, and Defendant Trundle sold 56% of their respective Class Period sales during this 8-day period. (¶ 110.) This confluence of timing and magnitude is clearly probative of scienter. Add to this the fact that, as shown above, the magnitude of the sale must be viewed in light of the alleged fact that the sale of Class B stock would entail a significant (10 votes per share) dilution of the owner's voting power, and these allegations take on even greater probative weight.

Finally, the magnitude of the Individual Defendants' sales must be viewed along a continuum where maximum profits and total loss of control are at one end, and minimum profits and maximum retention of control are at the other. Accordingly, the fact that the point on this continuum that the Individual Defendants chose to draw did not entail near-total divestment of their total holdings in MicroStrategy does not preclude an inference of an intent on the Individual Defendants' part to prof-

---

**49.** And, with regard to Defendant Saylor, it also must be noted that he is alleged to hold 55.2% of MicroStrategy's common stock outstanding. Thus, Saylor's sales chipped away

at his primary shareholder status, though to what extent is unclear from the Complaint and supplementary documents.

it from fraud *and* maintain control of the Company. Defendants mistakenly assume that the only motive probative of scienter is the motive to "cash out" fully by divesting themselves of their stake in the Company. Yet, the calculus clearly is more complicated, for, as one court has put it, "an insider may not always trade all his shares in the company for which he possesses the inside information; the trader may hold on to a portion of his shares to hedge against the unforeseen or to obscure the insider trading from the SEC."[50] *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1427 (9th Cir.1994).[51]

Thus, Defendants' argument that no inference of scienter can be drawn from the sales because the Individual Defendants "traded 4.5% of their total holdings—the CEO trading only 2.2% of his shares—at an average price of approximately 13% of the class period high, and less than half of the price to which the stock fell following the precipitating disclosure" is unpersuasive.[52] As discussed above, 4.5% in itself is a misleading figure in that it dilutes the respective percentages of all of the Individual Defendants except for Defendant Saylor. In addition, Saylor's sales—as well as those of the other Individual Defendants—must be viewed in the context of competing motivations (profiting from alleged fraud and maintaining control of the Company) that are both inferentially consistent with and supported by the allegations in the Complaint. Furthermore, that the Individual Defendants were not perfectly prescient in predicting when MicroStrategy stock would reach its high and also suffered significant losses upon the public revelation of their alleged fraud[53] does not erase the inference of scienter to be drawn from an examination of the amount, timing, and context of the Individual Defendants' alleged insider trades. Whether these allegations suffice to raise a strong inference of scienter need not be determined at this stage, however, as the Complaint contains other allegations as to Defendants' motive to commit fraud that must be considered.

## ii. Meeting Wall Street Estimates

Plaintiffs also allege that MicroStrategy generally was motivated to engage in fraud in order to meet expectations as to its performance and, consequently, to obtain more capital through its offerings of stock. (¶ 108.) This general allegation, though relevant, adds little by itself to the scienter calculus, because these are motives "possessed, to a certain degree, by

---

**50.** Thus, Defendants' argument that, because, in the end, "whatever profits the [Individual Defendants] made from their relatively insignificant trades pale in comparison to the declines they subsequently suffered," any inference of fraud from the sales is affirmatively negated is not very persuasive, for the facts alleged in the Complaint support an inference that the Individual Defendants wanted the best of both worlds: They wanted at once (i) to maximize the number of shares they sold at certain opportune times and thereby profit from the alleged fraud, and (ii) to minimize the need to sell Class B shares and thereby give up a significant degree of control of the Company. In any event, while the argument may *arguendo* serve to blunt the full force of the scienter inference, it does not eliminate the substantive contribution of the insider trades to the strength of an inference of scienter.

**51.** In *In re Worlds of Wonder*, the allegation was "essentially that these defendants possessed inside information on [the company's] imminent collapse, so one would expect that they would have sold a good proportion of their holdings," yet, "[o]n the contrary, most of these defendants sold only a minuscule fraction of their holdings … and ended up reaping the same large losses as did Plaintiffs when [the company] collapsed." *In re Worlds of Wonder*, 35 F.3d at 1427. In this case, however, the allegations suggest a situation where the Individual Defendants at once wanted to profit from the misstatements and retain control of, and remain for the duration with, the Company.

**52.** MicroStrategy Reply Brief, at 16.

**53.** Plaintiffs represented at the hearing, and Defendants did not contest, that MicroStrategy's stock was trading at approximately eight to ten times its IPO value when Defendants made these sales in October 1999.

every corporate officer." *In re Stratosphere Corp.*, 1 F.Supp.2d at 1116. The Complaint continues, however, by alleging that this general motive took more concrete form owing to three particular events: (i) MicroStrategy's IPO, the success of which was achieved in part through the filing of false fiscal year 1997 financial reports and from which Defendants raised approximately $48 million (¶ 26); (ii) MicroStrategy's sale, along with Defendants Bansal, Trundle, Lynch, and Ingari and seven other shareholders, of 4,000,000 Class A common shares, which occurred on the same day as the issuance of the Company's allegedly false and misleading 1998 financial results and which raised approximately $40 million (¶ 40); and (iii) MicroStrategy's announcement in February 2000, one month after the Company's release of fourth quarter and year-ended 1999 reports, of its efforts to raise nearly $1 billion though the sale of 6.5 million shares of Class A common stock, including 1.6 million shares owned by Defendant Saylor (¶ 53).[54] These specific factual allegations serve to particularize Defendants' motive in a way probative of scienter.[55]

### iii. Satisfaction of Credit Agreements

Finally, Plaintiffs allege that the Defendants "were further motivated [by a desire] ... to portray the Company favorably with actual and potential creditors from whom MicroStrategy needed to borrow funds." (¶ 109.) Specifically, the Complaint alleges that,

54. The Complaint further alleges that, had this offering come to fruition, Saylor would have received an additional $300 million. (¶ 108.) It appears, however, that the offering never occurred in the aftermath of the March 20, 2000, restatement announcement.

55. *See In re Datastream Sys., Inc. Sec. Litig.*, No. 6:99–0088–13, 2000 U.S.Dist. LEXIS 1468, at *9 n. 4 (D.S.C. Jan 31, 2000) (Plaintiffs' allegations that defendant "presented materially false information to the public in order to ensure the completion of a public offering that would provide him huge profits from the sale of his personally-held stock" was sufficient to plead scienter); *In re American Bank Note Holographics, Inc. Sec. Litig.*,

on March 26, 1999 the Company entered into a $25 million Credit Agreement with NationsBank, N.A. As a condition to borrowing funds under that Agreement, MicroStrategy was required to, among other things, maintain certain financial ratios. As the company later admitted after the Class Period in its Report on Form 10–Q/A filed with the SEC on or about May 30, 2000:

> [a]s a result of the restatement to our 1997, 1998 and 1999 financial statements ... we would not have been in compliance with all of the covenants contained in the line of credit agreement, therefore we would not have had the right to borrow amounts under the agreement.

(¶ 109.) As a general matter, an allegation pertaining to "a company's desire to maintain a high bond or credit rating [does not] qualif[y] as a sufficient motive for fraud in these circumstances, because if scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."[56] In this case, however, the Complaint's allegations concerning MicroStrategy's ability to comply with the specific terms of its credit agreement with NationsBank are sufficiently particularized so as to be probative of scienter. *See In re American Bank Note Holographics, Inc. Sec. Litig.*, 93 F.Supp.2d 424, 445 (S.D.N.Y.2000) (holding that defendants'

93 F.Supp.2d 424, 444–45 (S.D.N.Y.2000) ("[Defendant company] had the most to win by inflating the price of the IPO, and was thus motivated to make statements or omit facts that would result in a higher price.").

56. *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir.1996) (quotations omitted); *see, e.g., In re Crystal Brands Sec. Litig.*, 862 F.Supp. 745, 749 (D.Conn.1994) (holding that allegations of a motive to "maintain good relations with suppliers, retailers and lenders .... pertain to virtually any company that manufactures and distributes goods" and are therefore inadequate).

alleged motive "to enhance its ability to raise cash under [a] $30 million credit facility agreement ... [is] a sufficient motive to raise an inference of fraudulent intent"). Thus, these allegations not only form part of the totality of the circumstances to be considered in determining whether the Complaint's allegations raise a strong inference of scienter, but also corroborate any such strong inference to be drawn.

### e. Conclusion

An examination of the totality of the circumstances alleged by the Complaint compels the conclusion that Plaintiffs have met their burden under the PSLRA of pleading sufficient facts to raise a strong inference that the MicroStrategy Defendants acted with the requisite scienter.[57] Specifically, the Complaint's allegations as to (i) MicroStrategy's GAAP violations and restatement of financials; (ii) Defendant Saylor's public statements; (iii) Defen-

dants' actions with respect to the March 20, 2000, announcement and the subsequent correction; and (iv) Defendants' particularized motive and opportunity to profit from insider sales while retaining control of the Company, to meet Wall Street expectations and thereby maximize the proceeds reaped from public offerings of stock, and to prevent MicroStrategy from defaulting on its credit agreement with NationsBank cumulatively raise a strong inference that the MicroStrategy Defendants acted intentionally, consciously, or recklessly in violation of the securities laws. Just as otherwise-unremarkable individual points of colored paint in the aggregate become a Seurat painting, so, too, do the individual allegations in this case—which, when viewed in isolation may or may not by themselves give rise to a "strong inference" of scienter—collectively paint an equally compelling picture of scienter.[58] Accordingly, the motion of the

---

**57.** The allegations in the Complaint, moreover, are sufficiently particular with respect to each Defendant to satisfy the requirements of the PSLRA. *See, e.g., Brinker Capital Holdings, Inc. v. Imagex Servs., Inc.,* 178 F.R.D. 380, 383 (N.D.N.Y.1998) ("[T]o create a strong inference of scienter on the part of the defendant the PSLRA requires that facts be alleged with particularity as to that defendant."). The PSLRA merely requires securities fraud plaintiffs to "distinguish among those they sue and enlighten each defendant as to his or her part in the alleged fraud." *Coates v. Heartland Wireless Communications, Inc.,* 26 F.Supp.2d 910, 914 (N.D.Tex.1998). In this case, the Complaint specifies which report, announcement, or other communication allegedly implicates each Defendant, when those communications were made, and why the communications were false and misleading. (¶¶ 26, 29, 30–32, 34–42, 44–49, 51, 53, 56–57, 61–81.) *See, e.g., DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990) (Plaintiffs must allege "the who, what, when, where, and how: the first paragraph of any news story."). These allegations are further supplemented by other factual allegations specific to each Defendant—for example, the timing and extent of each Individual Defendant's insider sales—that are sufficiently specific that "each defendant [is] apprised of the specific nature of his alleged participation in the fraud." *Brinker,* 178 F.R.D. at 384. And, the Complaint does not "merely rely on the individual positions or committee memberships

within the ... organization," *Coates,* 26 F.Supp.2d at 916. (¶¶ 5, 21(a)–(f), 100–02, 110.) *See also Juntti v. Prudential–Bache Sec., Inc.,* No. 92–2066, 1993 WL 138523, at *2 (4th Cir. May 3, 1993) (unpublished disposition) ("Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation.") (quotation omitted). Accordingly, to inquire into whether the so-called "group pleading doctrine" applies here, or whether the doctrine remains viable in the aftermath of the PSLRA, is unnecessary. *See, e.g., In re GlenFed, Inc. Sec. Litig.,* 60 F.3d 591, 593 (9th Cir.1995) ("In cases of corporate fraud where the false and misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group published information,' it is reasonable to presume that these are the collective actions of the officers.") (citation omitted); *Orman v. America Online, Inc.,* No. 97–264–A, slip op. at 5 (E.D.Va. July 11, 1997).

**58.** It is well to remember that the entire analysis in this Memorandum Opinion proceeds on the premise that the allegations in the Complaint are true and that Plaintiffs are entitled to all favorable inferences to be drawn therefrom. Of course, this assumption disappears at the summary judgment stage, and the factual record in this case may ultimately not resemble the Complaint's allega-

MicroStrategy Defendants to dismiss the Complaint's claim under Section 10(b) of the Exchange Act and Rule 10b–5 cannot be granted on the ground that Plaintiffs have failed to satisfy the PSLRA's heightened pleading requirements.

### 2. Count IV: PricewaterhouseCoopers[59]

Plaintiffs also have brought a claim under Section 10(b) of the Exchange Act and Rule 10b–5 against Defendant Pr icewaterhouseCoopers, MicroStrategy's principal accountant and auditor. The PSLRA's pleading requirements do not distinguish between corporate defendants and accountants; thus, while the Complaint's factual allegations against PwC must be separately considered, the pleading principles elucidated above apply with equal force to the Complaint's allegations against PwC. It bears repeating, however, that the task at hand is an assessment of whether the factual allegations in the Complaint collectively raise a strong inference that PwC possessed the "requisite state of mind" of intentional or conscious fraud or recklessness in making its alleged misrepresentations and omissions. In this regard, no factual allegations relevant to and probative of scienter—including particularized allegations of motive and opportunity—should be excluded from the ultimate assessment as to the strength of the inference of scienter to be drawn from the Complaint.

### a. GAAP and GAAS Violations

According to the Complaint, PwC, in conformance with its contractual obligations to MicroStrategy as its auditor and principal accounting firm, was required to:

(i) audit MicroStrategy's financial statements in accordance with GAAS; (ii) report the results of audits and quarterly reviews to MicroStrategy and its Board of Directors' Audit Committee; and [sic] (iii) issue Audit Reports regarding the conformance of the Company's financial statements with GAAP, which were incorporated into SEC filings and other reports distributed to shareholders and members of the public; and (iv) assist in the preparation and review of MicroStrategy's quarterly financial statements which were included in the Company's filings with the SEC.

(¶ 127.) The Complaint further alleges that PwC violated numerous GAAS provisions "by, among other things, failing to expand or otherwise conduct its audits with respect to revenue recognition by MicroStrategy," and by its "failure to qualify, modify or abstain from issuing its audit opinions on MicroStrategy's fiscal 1997, 1998 and 1999 financial statements when it knew or recklessly turned a blind eye to numerous adverse facts and 'red flags.'"[60] (¶¶ 132–34.) According to the Complaint, specific standards govern an auditor's conduct of an audit, including the auditor's duty "to maintain an independence in mental attitude in all matters related to the

tions. For present purposes, however, the Complaint as a whole pleads enough facts to pass muster under the PSLRA's "strong inference" pleading standard.

**59.** For the purposes of this Section, the term "Defendant" refers to Defendant PricewaterhouseCoopers.

**60.** The relationship between GAAP and GAAS so far as an auditor is concerned is as follows:

[SEC] regulations stipulate that ... financial reports must be audited by an independent certified public accountant in accordance with generally accepted auditing standards. By examining the corporation's

books and records, the independent auditor determines whether the financial reports of the corporation have been prepared in accordance with generally accepted accounting principles. The auditor then issues an opinion as to whether the financial statements, taken as a whole, fairly present the financial position and operations of the corporation for the relevant period.

*United States v. Arthur Young & Co.*, 465 U.S. 805, 810, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984). Because PwC's alleged GAAS violations include its alleged participation in and approval of MicroStrategy's recognition practices in violation of GAAP, references to PwC's GAAS violations also include any and all alleged violations of GAAP.

assignment," "to adequately plan and supervise the work of its staff and to establish and carry out procedures reasonably designed to search for and detect the existence of material misstatements caused by error or fraud," and to obtain "competent evidential matter ... through inspection, observation, inquiries and confirmations [in order] to afford a reasonable basis for an opinion regarding the financial statements under audit." (¶¶ 134–35.)

As already discussed, bare allegations of rules violations do not suffice by themselves to meet the PSLRA pleading standard, for, as a rule, "general allegations of GAAP and GAAS violations fail to satisfy the scienter requirements of Section 10(b) and Rule 10b–5. The mere misapplication of accounting principles by an independent auditor does not establish scienter." *Zucker v. Sasaki*, 963 F.Supp. 301, 307 (S.D.N.Y.1997); *see, e.g., SEC v. Price Waterhouse*, 797 F.Supp. 1217, 1240 (S.D.N.Y. 1992). More is required; specifically, a plaintiff must also allege facts tending to show that "the accounting practices were so deficient that the audit amounted to no audit at all or that no reasonable accountant would have made the same decisions if confronted with the same facts." *Zucker*, 963 F.Supp. at 307 (quotations omitted). In other words, a plaintiff alleging an auditor's scienter cannot meet the PSLRA pleading standard simply by alleging that the auditor violated GAAS or other pertinent accounting and auditing principles in performing an audit and other services— specifically, by solely relying on the inferentially ambiguous *fact* that an audit did not conform to GAAS; instead, a plaintiff must allege other facts indicating that the *nature* of those violations was such that scienter is properly inferred.[61] In sum, to meet the PSLRA pleading burden, a plaintiff must allege facts that place the GAAS violations in a context that "paint a portrait of an audit so reckless that a jury could infer an intent to defraud." *Jacobs v. Coopers & Lybrand*, No. 97–CIV–3374 (RPP), 1999 WL 101772, at *14 (S.D.N.Y. March 1, 1999).

Plaintiffs offer four factual allegations to support their scienter pleading burden against PwC: (1) the magnitude of the GAAP and GAAS violations and the restatement that followed (¶¶ 3, 13–14, 55–56, 65–80, 131–35); (2) PwC's "unfettered access" to the Company's resources and knowledge of MicroStrategy's operations and software contract arrangements (¶¶ 138–42); (3) PwC's disregard of "red flags" regarding improper revenue recognition issues (¶¶ 143–44); and (4) PwC's violation of the independence requirement and its motive "to maintain MicroStrategy's appearance of profitability" (¶¶ 145–58). Each of these factual allegations provides context and content to Plaintiffs' overarching allegation that PwC's GAAS violations invite a cogent and persuasive— that is, a strong—inference of scienter. Each of these supplementary allegations are separately considered.

### b. The Magnitude of the Violations of GAAP and the Subsequent Restatement

▮ As discussed above, the magnitude and pervasiveness of MicroStrategy's financial restatements and the relative simplicity of the accounting principles violated in this case lend further probative weight to Plaintiffs' allegations that the GAAP violations in this case raise a strong inference of scienter. The same conclusion applies to PwC.

First, Plaintiffs allege that PwC's failure to detect MicroStrategy's violations of GAAP or otherwise to abide by GAAS in conducting its audits of MicroStrategy's 1997, 1998, and 1999 financial reports and in assisting the Company in quarterly re-

---

**61.** To reiterate, the general rule that bare allegations that GAAP and GAAS were not followed in conducting an audit simply states the unremarkable proposition that such allegations, standing alone, support inferences of both culpable and nonculpable states of mind that are of equal strength, and that, without other allegations shifting the balance of inferences to be drawn, such allegations cannot support a "strong inference" of scienter.

ports during the Class Period resulted in false reports of net income that aggregated to $18.9 million, when, in fact, the Company incurred net losses that aggregated to $36.8 million. (¶¶ 3, 99.) In addition, these GAAP violations resulted in false reports of revenues that aggregated to an overstatement of $66 million. (¶ 3.) Second, the Complaint also alleges that the accounting principles violated in this case are so simple so as to compel a stronger inference that PwC's failure to detect them resulted from either conscious fraud or severe recklessness.[62] That these violations occurred consistently over the entire Class Period (¶¶ 72–81), resulted in such a large restatement, and involved the violation of relatively straightforward accounting principles is probative of scienter.

Also alleged is the celerity with which MicroStrategy and PwC were able to review the Company's financials, catch the accounting irregularities, and announce a restatement after the publication of the March 6, 2000, *Forbes* article. (¶¶ 13, 55–56.) The alleged fact that MicroStrategy and PwC were able to conduct, within two weeks after the publication of the *Forbes* article, "a ... detailed review of MicroStrategy's significant contracts" from the preceding two years further supports the inference of scienter stemming from the magnitude of the restatement and the simplicity of the GAAP principles violated in this case. This fact also effectively serves to rebut Defendants' contention that the complexity of the accounting principles at issue mitigate any inferences of scienter.

*See In re First Merchants,* No. 97–C–2715, 1998 WL 781118, at *10, 1998 U.S.Dist. LEXIS 17760, at *32 (N.D.Ill. Nov. 4, 1998) (finding that the magnitude of the fraud combined with allegations showing the ease with which an independent officer discovered discrepancies "suggest[ ] a deliberate ignorance" on auditor's part).

It is simply a matter of common sense and logic—particularly given the special expertise of accounting firms—that the less complex the rules violated, the greater the magnitude of the irregularities, and the more frequent the violations, the stronger is the inference that conscious fraud or recklessness is the explanation for the auditor's role in the violations.[63] And, the fact that PwC was able quickly to identify and correct these violations from information accumulated for over two years weakens the inference that PwC acted with a nonculpable state of mind. Yet, the inquiry into the strength of the inference of scienter to be drawn from the Complaint need not stop here, as the Complaint contains additional allegations relating to PwC.

### c. PwC's Knowledge of MicroStrategy's Contract Arrangements

Plaintiffs further allege that, given the close working relationship between PwC and MicroStrategy, the GAAS violations take on further inferential weight in favor of scienter. (¶ 24.) Specifically, the Complaint alleges that PwC "had access to the Company's key personnel, accounting

---

**62.** *See, e.g., In re Next Level Sys., Inc. Sec. Litig.,* No. 97–C–7362, 1999 WL 387446, at *11 (N.D.Ill. March 31, 1999) (" '[T]he magnitude of reporting errors may lend weight to allegations of recklessness where defendants were in a position to detect the errors.' ") (quoting *Rehm v. Eagle Finance Corp.,* 954 F.Supp. 1246, 1256 (N.D.Ill.1997)); *Chalverus,* 59 F.Supp.2d at 234 ("[S]ignificant overstatements of revenue tend to support the conclusion that the defendants acted with scienter."); *see also Leslie Fay Cos., Inc. Sec. Litig.,* 835 F.Supp. 167, 175 (S.D.N.Y.1993) ("[I]n cases where small accounting errors only ripple through the corporate books, a court may conclude ... that an accountant's

failure to discover his client's fraud was not sufficiently reckless to sustain a 10b–5 claim. On the other hand, when tidal waves of accounting fraud are alleged, it may be determined that the accountant's failure to discover the client's fraud raises an inference of scienter on the face of the pleading."); *Carley Capital Group,* 27 F.Supp.2d at 1339–40.

**63.** Although the allegation specifically characterizing the principles as "not complex" is contained in the part of the Complaint devoted to the scienter of the MicroStrategy Defendants, the factual bases for the characterization are found in the general body of the Complaint. (¶¶ 65–80.)

books and records and transactional documents, including licensing agreements, at all relevant times," and otherwise maintained a pervasive presence at the Company. (¶¶ 24b, 138–40.) Again, these allegations, by themselves, would not be enough to raise a strong inference of scienter, for such allegations are insufficiently concrete to support such an inference. *See, e.g., Kennilworth Partners LP v. Cendant Corp.*, 59 F.Supp.2d 417, 429 (D.N.J.1999) ("[S]tatement[s that] could be made in relation to the auditor of every corporation" are insufficient to plead scienter, for "[i]f it were sufficient ..., it might make every auditor liable in cases of securities fraud."); *Queen Uno Ltd. Partnership v. Coeur D'Alene Mines Corp.*, 2 F.Supp.2d 1345, 1360 (D.Colo.1998). Yet, these allegations do not stand alone or exist in a vacuum; they provide important information on the context in which PwC conducted its audits of MicroStrategy's financial reports and assisted in the preparation of other public statements. And, this information is relevant to assessing the strength of any scienter inference. To be sure, the mere fact that PwC had access to MicroStrategy does not necessarily mean that it was aware of the alleged fraud at the Company. But it is equally apparent that the greater PwC's access to and involvement with MicroStrategy's operations, the more support an inference of scienter takes on. Put another way, the alleged nature and level of PwC's access to MicroStrategy serve as the lens through which PwC's specific GAAS and GAAP violations must be viewed. In this regard, the Complaint's allegations that PwC affirmatively reviewed the purported NCR, Primark, and Exchange agreements, yet allowed the Company to recognize revenues from these agreements before they were signed, illuminate important aspects of PwC's role in and knowledge of these GAAP violations and the inferences to be drawn from PwC's violations of GAAS. (¶¶ 141–42.)

As to the NCR contract revenue-recognition issue, for instance, it is simply the case that the importance of this "water-shed" agreement to MicroStrategy and its enormous impact on the Company's financial status make it less likely that PwC's auditors were unaware that revenue from this agreement was recognized before any contract existed between the parties, for "[t]he cumulative number and size of the financial misrepresentations are too significant to be products of simple negligence or other innocent error." *Hudson Venture Partners, LP v. Patriot Aviation Group, Inc.*, 98–CIV–4132–(DLC), 1999 WL 76803, at *4, 1999 U.S.Dist. LEXIS 1518, at *11 (S.D.N.Y. Feb. 16, 1999); *see In re Next Level Sys., Inc. Sec. Litig.*, No. 97–C–7362, 1999 WL 387446, at *11 (N.D.Ill. March 31, 1999). Just as "[i]t should be clearly obvious to even a beginning accountant or auditor that a contract to perform services that is dated December 31, 1996, should not be recorded as revenue in November of 1996," it should have been equally obvious that any revenues from the NCR, Exchange, and Primark contracts should not have been recognized before they were duly executed. *In re Transcrypt Int'l Sec. Litig.*, No. 4:98CV3099, 1999 U.S.Dist. LEXIS 17540, at *28 (D.Neb. Nov. 4, 1999). That it was not so to PwC clearly raises an inference of scienter.

**d. PwC's Disregard of "Red Flags"**

Plaintiffs also allege that PwC disregarded "red flags" that should have alerted it to the improper revenue recognition practices at MicroStrategy. This, Plaintiffs argue, raises an inference of scienter. (¶ 143–44.) Many courts have held that allegations that an auditor ignored "red flags" is probative of fraudulent intent or recklessness. *See, e.g., In re Health Management*, 970 F.Supp. at 203; *In re Oxford*, 51 F.Supp.2d at 295–96. Of course, this is a matter of degree; the probative value of allegations that an auditor ignored "red flags" is a function of the nature and number of such flags. Thus, as one court put it, "while [defendant's] ignorance of warning signs in one sense demonstrate[s] that it was merely negligent, allegations

that, with gross recklessness, [defendant] ignored multiple 'red flags' could reasonably support an inference that [defendant] acted with intent." *In re Leslie Fay Cos., Inc.,* 871 F.Supp. 686, 699 (S.D.N.Y.1995).

Here, the Complaint alleges that PwC failed to heed an "Audit Risk Alert—1998/99" issued by the AICPA stating that "[a]uditors should be alert for significant unusual or complex transactions, especially those that occur at or near the end of a reporting period. Also suspect are high volumes of revenues recognized in the last few weeks—or days—of a reporting period." (¶ 143.) Thus, claim Plaintiffs, PwC must have consciously or recklessly disregarded the improper recognition of revenues from the NCR, Exchange, and Primark agreements, because they were announced only days after the close of the quarter, involved unusually significant dollar amounts, and were complex agreements that entailed ongoing relationships between MicroStrategy and the contracting companies. The Complaint, in addition, also alleges that "defendant Saylor's statements to the press that evidenced his willingness to bend the truth to achieve the results he needed," the insider sales of the Individual Defendants, and "that but for the improper recognition of revenues MicroStrategy would be in default of its credit agreement with NationsBank, N.A." should have alerted PwC and compelled it "to significantly increase its audit field work scope and analyses to satisfy itself regarding the revenue recognition associated not only with these contracts but other deals as well." (¶¶ 143–44.)

These allegations—contrary to PwC's suggestion—constitute more than mere allegations "that certain events or circumstances suggested risk"; rather, they raise not only the fair inference that, given the distinct characteristics of the NCR, Exchange, and Primark agreements and PwC's own policies, PwC *in fact* was vigilant in dealing with these contracts, but also the concomitant inference that PwC's failure to report that revenues from these contracts were misapplied in violation of a simple principle of accounting that boils down to "Don't count your money before it's yours" [64] must have resulted from a conscious decision to do so or from severe recklessness on PwC's part. Thus, these considerations must help inform the determination of whether the Complaint as a whole raises a strong inference of scienter.

**e. PwC's Violation of the Independence Requirement**

To show scienter, Plaintiffs also rely on their allegations that, by acting as a consultant to users of MicroStrategy products and as a "channel partner" and reseller of those products, PwC violated a fundamental principle of GAAS that an auditor maintain independence from its clients. This lack of independence, they argue, is corroborative of a strong inference of scienter. (¶¶ 145–62.) Specifically, PwC allegedly directly encouraged end-users to purchase MicroStrategy products and entered into partnering relationships with other software developers that cross-market the Company's products. By virtue of this relationship with MicroStrategy, PwC received significant discounts off the list price for MicroStrategy's products and served as a "systems integrator" for these products by assisting clients in their implementation, thereby earning "substantial financial rewards," including $188,000 in licensing fees and an undisclosed amount for consulting fees that were reported by

---

**64.** Indeed, as indicated above, the Complaint alleges that PwC published *The User–Friendly Guide to Understanding Software Revenue Recognition,* which states:

> If a signed arrangement has been entered into subsequent to the date of revenue recognition ... revenue was improperly recognized. Written contracts must be signed by both parties prior to revenue recognition.

> The signatures must be obtained as of the balance sheet date in order to include the transaction in a given period's revenues.

This allegation clearly weakens the argument that this particular accounting principle is complex and correspondingly makes it more likely that the GAAP violations were made with scienter. (¶ 144.)

the *Washington Post* to have been earned by PwC from eight deals. (¶ 147.) Thus, claim Plaintiffs,

> PWC had a direct stake in the success of MicroStrategy. The more products that the Company could sell with PWC's assistance that required systems integration services, the more PWC stood to benefit. MicroStrategy's ability to sell more products was clearly enhanced by the illusion of its profitability. These service-related contracts required long term commitments on the part of the Company. Customers would be less likely to enter into such arrangements unless there was clear assurance of the Company's financial health.

(¶ 148.) This involvement, the Complaint alleges, "significantly compromised PWC's independence and contributed to the auditor's failure to comply with GAAS" and gave PwC a motive, either consciously or recklessly, to permit MicroStrategy's accounting practices to remain unreported. (¶¶ 149, 155–58.)

That an auditor must remain independent of its client is a fundamental principle of GAAS, and courts have long recognized the importance of independence in the proper execution of an auditor's duties.[65] Thus, GAAS holds, as the Complaint notes, that "[i]t is of utmost importance to the profession that the general public maintain confidence in the independence of independent auditors" and instructs auditors that,

> [t]o be independent, the auditor must be intellectually honest; to be recognized as independent, he must be free from any obligation to or interest in the client, its management, or its owners.... Independent auditors should not only be independent in fact; they should avoid

situations that might lead outsiders to doubt their independence. (¶ 153 (quoting AU § 220.03).) Courts have also recognized, however, that it is a reality of the business world that accountants and accounting firms do not work for free and that, consequently, to infer scienter from the mere fact that an auditor received compensation for professional services would subject every independent auditor to suit and "effectively abolish the requirement, as against professional defendants in a securities fraud action, of pleading facts which support a strong inference of scienter." *Friedman v. Arizona World Nurseries Ltd. Partnership,* 730 F.Supp. 521, 532 (S.D.N.Y.1990). Given this, the general rule is that, without more, "receipt of professional fees is not sufficient to raise a strong inference that an accounting firm committed fraud." *Queen Uno,* 2 F.Supp.2d at 1360; *see also, e.g., In re Worlds of Wonder,* 35 F.3d at 1427 n. 7; *Price Waterhouse,* 797 F.Supp. at 1242.

In this case, however, Plaintiffs have alleged more than just a desire to receive compensation for professional auditing duties on the part of PwC. Rather, the Complaint alleges that, by agreeing to sell MicroStrategy's products and to serve as a consultant with regard to those products, PwC took on a vested interest in the performance and profitability of the Company beyond that related to a desire to be paid for its auditing services. By violating the GAAS requirement of independence, PwC has weakened its ability to rely on its reputation in countering as "irrational" allegations that it participated in a client's fraud, for it is that very reputation that an allegation of a lack of independence questions.[66] Moreover, that PwC clearly would

---

**65.** *See, e.g., Arthur Young & Co.,* 465 U.S. at 817–18, 104 S.Ct. 1495 ("By certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a public responsibility transcending any employment relationship with the client. The independent public accountant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to the investing public. This 'public watchdog' function

demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust.").

**66.** *See generally, e.g., DiLeo v. Ernst & Young,* 901 F.2d 624, 629 (7th Cir.1990) ("An accountant's greatest asset is its reputation for honesty, followed closely by its reputation for careful work. Fees for two years' audits could not approach the losses [the firm]

have received concrete benefits, through its partnership with MicroStrategy, from certifying and maintaining the Company's allegedly false and misleading financial reports lends more weight to a stronger inference of scienter.

### f. Conclusion

The Complaint's allegations as to (i) PwC's GAAS violations; (ii) MicroStrategy's GAAP violations and subsequent restatements; (iii) PwC's level of access to the Company and necessary knowledge of MicroStrategy's operations and most important contracts; (iv) the existence of circumstances suggesting that PwC was or should have been aware of MicroStrategy's accounting practices; and (v) PwC's acquisition of a vested stake in MicroStrategy's fortunes, taken in context and in light of the totality of the circumstances, raise a strong—that is, a cogent and persuasive— inference that PwC acted with scienter. These allegations paint a picture strongly supporting an inference that PwC intentionally or consciously participated in MicroStrategy's alleged fraud, or that its conduct of its audits was "so deficient that the audit amounted to no audit at all or that no reasonable accountant would have made the same decisions if confronted with the same facts." *Zucker*, 963 F.Supp. at 307 (quotations omitted). Accordingly, Plaintiffs have satisfied their pleading burden under the PSLRA to maintain their Section 10(b) and Rule 10b–5 claim against PwC, and PwC's threshold motion to dismiss must be denied.

### B. Materiality

The Complaint alleges, as it must, that MicroStrategy's fraudulent conduct is material. The MicroStrategy Defendants contend, however, that the Company's improper recognition of revenues on purported contracts prior to agreements being finalized—the "contract recognition issue"—is not material as a matter of law.[67] Specifically, they argue that, as a logical matter, the contract recognition issue would not have affected a reasonable investor, for, "[b]y the time of the Company's March 20, 2000 press release (which, plaintiffs allege, precipitated the decline in stock price), whether revenue from a particular contract had been booked in the third versus the fourth quarter of 1999 was immaterial to the prospective financial outlook of the Company."[68] In addition, Defendants argue that the real issue is "contract accounting," which spreads the recognition of revenues over the entire contract period as opposed to separating it between the software and services components, and not when revenues from contracts are recorded in relation to the execution of those contracts. So applied, Defendants argue, contract accounting reveals that the contract recognition issue only concerns de minimis amounts of money—not enough to influence a reasonable investor.[69]

Defendants further argue that the Complaint itself demonstrates that the revelation of MicroStrategy's accounting problems regarding the NCR, Exchange Applications, and Primark agreements did not affect the market and MicroStrategy's stock price. In support, they point to the fact (i) that the high mark for the price of MicroStrategy's stock was reached *after* *Forbes* published an article reporting accounting irregularities in general and con-

---

would suffer from a perception that it would muffle a client's fraud.... [The firm]'s partners shared none of the gain from any fraud and were exposed to a large fraction of the loss. It would have been irrational for any of them to have joined cause with [the Company]."").

**67.** For purposes of this Section, the term "Defendants" refers only to the MicroStrategy Defendants.

**68.** MicroStrategy Brief, at 19.

**69.** Defendants suggest a hypothetical to demonstrate that application of contract accounting principles to a contract for a $1 million license and a $1 million service agreement that is reported one day too early amounts only to an overstatement of $685—i.e., one day's worth of revenue.

tract execution issues in particular; (ii) that the Company's March 20, 2000, press release, which precipitated the massive loss in the price of MicroStrategy stock, only referred to contract accounting and not to any contract execution issues; and (iii) that there was only a negligible loss in stock price after the April 13, 2000, announcement that the Company was revising its financials due, in part, to contract execution accounting issues. These contentions merit careful scrutiny.

Materiality is an objective and fact-specific determination that "involves the significance of an omitted or misrepresented fact to a reasonable investor." *Gasner v. Board of Supervisors*, 103 F.3d 351, 356 (4th Cir.1996); *cf. TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 445, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Thus,

> A fact stated or omitted is material if there is a substantial likelihood that a reasonable [investor] (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact.

*Longman v. Food Lion, Inc.*, 197 F.3d 675, 682–83 (4th Cir.1999); *see Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Phillips*, 190 F.3d at 614. As such, a court considering a motion to dismiss for failure to plead materiality must consider that

> [t]he determination of materiality is a mixed question of law and fact that generally should be presented to a jury.... Only if no reasonable juror could determine that the [alleged statements] would have 'assumed actual significance in the deliberations of the reasonable [investor]' should materiality be determined as a matter of law.

*Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir.1999) (citations omitted); *see Basic*, 485 U.S. at 232–34, 108 S.Ct. 978; *Marucci v. Overland Data, Inc.*, [1999–2000 Transfer Binder] 1999 WL 1027053, Fed.Sec.Rep. (CCH) ¶ 90,644, at 92,922 (S.D.Cal. Aug. 2, 1999). Put differently, "a complaint may not be properly dismissed pursuant to Rule 12(b)(6) on the grounds that the alleged misstatements or omissions are not material unless they are 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Marksman*, 927 F.Supp. at 1306 (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985)).

It is difficult to conclude, as a matter of law, that no reasonable jury could conclude that it would not have been of any significance to the minds of reasonable investors that MicroStrategy, in violation of GAAP, was recognizing revenues from contracts even before these contracts were signed and legally enforceable and that, partly because of such practices, the Company's financials were significantly overstated. First, it is unlikely that a reasonable investor would have found MicroStrategy's breathtaking overstatements of revenues insignificant.[70] Second, given that the NCR, Primark, and Exchange Applications agreements were among the most important transactions in MicroStrategy's history, it strains credulity to argue that a reasonable investor in the Company would have been unaffected by information that MicroStrategy was improperly recognizing revenues from these contracts. Indeed, at the very least, improper recognition must raise in the mind of a reasonable investor concerns about the management of a company, for, as one court put it, "the purpose behind such accounting rules is to protect investors by giving them a clear and accu-

---

**70.** *See, e.g., Ganino v. Citizens Utils. Co.*, No. 99–7904, 2000 WL 1262550 (2d Cir. Sept. 6, 2000) ("Misstatements of income could be material because 'earnings reports are among the pieces of data that investors find most relevant to their investment decisions.'") (quoting *In re Burlington Coat Factory*, 114 F.3d at 1420 n. 9); *In re Gupta Corp. Sec.*

*Litig.*, 900 F.Supp. 1217, 1231 (N.D.Cal.1994) ("The materiality of a $1.1 million dollar correction to revenue, which causes earnings to be restated from a profit of $520,000 to a loss of $250,000, and which represents more than 5 percent of total revenues, is beyond question.").

rate picture of the position and performance of the business, [and] the notion that the reasonable investor would find defendants' alleged overstatements of revenues to be 'material' information has intuitive force." *Marksman*, 927 F.Supp. at 1306. These considerations compel the conclusion that Plaintiffs have adequately pled the materiality of the so-called "contract execution" issue.

It also appears that Defendants misconstrue their argument as one relating to materiality, when, in fact, it attacks the loss causation element of Plaintiffs' securities fraud claim. "Loss causation ... is proof that the matter misrepresented or omitted proximately caused the damage that the plaintiffs suffered." [71] In the motion at bar, MicroStrategy specifically contests whether the decline in MicroStrategy's stock price on March 20, 2000, was caused by the revelation of information regarding the Company's contract accounting or, instead, its contract execution problems. In this regard, "the relevant inquiry is whether the misstatement, in some reasonably direct way, 'touches upon' the reason for the investment's decline in value." *Carlton v. Franklin*, No. 89–2942, 1990 WL 116788, at *4 (4th Cir.1990) (unpublished opinion) (quoting *Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir. Unit A 1981)). Here, Plaintiffs have pled sufficient facts on which a reasonable jury could conclude that the cause

of the March 20, 2000, decline was in part the Company's improper contract recognition practices.[72] (¶ 113.) Thus, Defendants' argument at this stage is unpersuasive and is more appropriately reserved for consideration at the summary judgment stage.[73] Accordingly, Defendants' motion to dismiss Count I of the Complaint on the ground that Plaintiffs have failed to plead materiality must be denied.

## IV. SECTION 20(A) OF THE EXCHANGE ACT

The Complaint also claims, in Count II, that Defendants Saylor, Bansal, Trundle, and Lynch ("Control Group Defendants"), by reason of their senior management positions and substantial stock ownership, were the controlling persons of MicroStrategy and, accordingly, are liable to Plaintiffs and the Class pursuant to Section 20(a) of the Exchange Act ("Section 20(a)"), which provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).[74] Defendants, however, seek dismissal on the ground that

---

**71.** *Carlton v. Franklin,* No. 89–2942, 1990 WL 116788, at *3–4 (4th Cir.1990) (unpublished opinion) (quoting *Bennett v. U.S. Trust Co.,* 770 F.2d 308, 313 (2d Cir.1985)).

**72.** *See Robbins v. Koger Properties, Inc.,* 116 F.3d 1441, 1447–48 (11th Cir.1997) ("Because market responses, such as stock downturns, are often the result of many different, complex, and often unknowable factors, the plaintiff need not show that the defendant's act was the sole and exclusive cause of the injury he has suffered; he need only show that it was substantial, i.e., a significant contributing cause.") (quotations, citations, and footnote omitted).

**73.** *See Seagoing Uniform Corp. v. Texaco, Inc.,* 705 F.Supp. 918, 933 (S.D.N.Y.1989) ("Regardless of whether or not plaintiff can prove

by a preponderance of the evidence each and every one of its claims, the question of loss, if any, caused by defendants' alleged omissions and misrepresentations is a question of fact not appropriate, under these circumstances, for resolution in a motion for dismissal."); *cf. Silver v. H & R Block, Inc.,* 105 F.3d 394, 397 (8th Cir.1997) (on summary judgment motion, declining to infer that statements at issue were misleading "from the movement of stock price alone ... given the abundance of market variables").

**74.** For purposes of this Part, the term "Defendants" refers to the Control Group Defendants.

Plaintiffs have failed to allege that the Control Group Defendants culpably participated in MicroStrategy's fraud. For the following reasons, Defendants' motion must also fail.

■ Because the task at hand is again one of statutory construction, the analysis must begin with the plain language of Section 20(a), for "where ... the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *Ron Pair*, 489 U.S. at 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)). Consequently, "when a statute speaks with clarity to an issue, judicial inquiry into the statute's meaning in all but the most extraordinary circumstance, is finished." *Metropolitan Stevedore Co. v. Rambo*, 515 U.S. 291, 294, 115 S.Ct. 2144, 132 L.Ed.2d 226 (1995) (quoting *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992)). Here, Section 20(a) on its face plainly imposes secondary liability to "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder" and instructs that such liability be imposed "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). Thus, Section 20(a) clearly assigns secondary liability upon a demonstration of a primary violation by the controlled person and of direct or indirect control by the controlling person, subject only to a "proviso" in the nature of an affirmative defense that the controlling person acted in good faith. *Id.* It does not prescribe culpability as a prima facie element of secondary liability; rather, it provides for an exception to liability where

there is *no culpability* on the part of the defendant. This clear language compels the construction that Section 20(a) does not require a plaintiff to demonstrate culpable participation and instead provides the defendant an affirmative defense of "good faith."

This interpretation of the plain requirements of Section 20(a) is confirmed by an analysis of Section 20(a)'s particular role as part of the Exchange Act. A court must always be mindful in construing a statute that "[s]tatutory language must always be read in its proper context," and that, " '[i]n ascertaining the plain meaning of [a] statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.'" *McCarthy v. Bronson*, 500 U.S. 136, 139, 111 S.Ct. 1737, 114 L.Ed.2d 194 (1991) (quoting *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988)). In this case, to construe Section 20(a) to require Plaintiffs to demonstrate culpable participation on the part of the controlling person would effectively conflate the requirements for secondary liability under Section 20(a) and those for primary liability under Section 10(b) and Rule 10b–5, thereby reducing Section 20(a) to surplusage. *See Haynes v. Anderson & Strudwick, Inc.*, 508 F.Supp. 1303, 1315 (E.D.Va.1981). That is, under such an interpretation, "plaintiffs might as well sue the controlling person directly under the anti-fraud provisions as under § 20(a)." *Id.* Yet, courts should be loathe to interpret Congress's pronouncements to be redundant, such that Congress meant to "paralyze with one hand what it sought to promote with the other."[75] Because "there would be little reason for the controlling person provision unless it differed in some meaningful ways from the

---

**75.** *American Paper Inst., Inc. v. American Elec. Power Serv. Corp.*, 461 U.S. 402, 421, 103 S.Ct. 1921, 76 L.Ed.2d 22 (1983); *see Moskal v. United States*, 498 U.S. 103, 109–10, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990) (It is an "established principle that a court should 'give effect, if possible, to every clause and word of a statute.'") (quoting *United States v.* *Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955)); *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 308, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961) (Where "[t]he statute admits a reasonable construction which gives effect to all of its provisions ... we will not adopt a strained reading which renders one part a mere redundancy.").

standards of noncontrolling person liability," therefore, Section 20(a) must be read not to require Plaintiffs to show the culpable participation of the controlling person. *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 958 n. 23 (5th Cir.1981).[76]

76. Finally, although courts that have addressed this issue are split as to whether a plaintiff must show that a defendant culpably participated in the underlying violation of the securities laws, that the majority of courts has reached the same conclusion further confirms this interpretation. A minority of courts—including the Third Circuit—requires a plaintiff to establish not only primary liability and control, but also "that the defendant was a culpable participant in the fraud." *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 890 (3d Cir.1975); *see also Sharp v. Coopers & Lybrand*, 649 F.2d 175, 185 (3d Cir.1981) ("One element of any case imposing liability under § 20(a) is culpable participation in the securities violation.") (quotation omitted); *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1299 (2d Cir. 1973) (in banc) ("The intent of Congress ... was obviously to impose liability only on those directors who fall within this definition of control and who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons."); *Gordon v. Burr*, 506 F.2d 1080, 1085–86 (2d Cir.1974) (rejecting secondary liability on grounds that defendant had no "knowledge of the fraudulent representations or in any meaningful sense culpably participated in them"). *But see Marbury Management Inc. v. Kohn*, 629 F.2d 705, 716 (2d Cir.1980). However, the majority of courts—including the Fifth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits—only requires a plaintiff to establish a primary violation and control by the controlling person over the controlled person. *See, e.g., Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1304–05 (10th Cir.1998); *Brown v. Enstar Group, Inc.*, 84 F.3d 393, 396 (11th Cir. 1996); *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir.1992); *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir.1990); *Paul F. Newton & Co. v. Texas Commerce Bank*, 630 F.2d 1111, 1120 (5th Cir.1980); *Marbury Management*, 629 F.2d at 716; *Myzel v. Fields*, 386 F.2d 718, 738 (8th Cir.1967). On this view, a plaintiff must make a showing as to "defendant's culpable participation," and such a showing then shifts the burden of proof to the defendant "to prove his good faith." *Hollinger*, 914 F.2d at 1575.

As it happens, the Fourth Circuit has not definitively determined which of these ap-

▮ Thus, the language of the Exchange Act in general and Section 20(a) in particular compel the conclusion that Plaintiffs do not have to plead culpable participation in their Complaint to state a claim under Section 20(a). Accordingly, if

proaches, if any, is appropriate under Section 20(a). In *Carpenter v. Harris, Upham & Co.*, 594 F.2d 388 (4th Cir.1979), the Fourth Circuit over twenty years ago noted that

[c]learly Congress had rejected an insurer's liability standard for controlling persons in favor of a fiduciary standard [imposing] a duty to take due care. The intent of Congress reflected a desire to impose liability only on those who fall within its definition of control and who are in some meaningful sense culpable participants in the acts perpetrated by the controlled person.

*Id.* at 394. Some district courts in this circuit, moreover, have adopted the Third Circuit's approach, which requires a plaintiff to show culpability on the part of the controlling person. *See, e.g., Criimi Mae*, 94 F.Supp.2d at 657; *In re Cryomedical Sciences, Inc. Sec. Litig.*, 884 F.Supp. 1001, 1012 (D.Md.1995); *Walker v. Cardinal Sav. & Loan Ass'n*, 690 F.Supp. 494, 500 (E.D.Va.1988). In *Carpenter*, however, the Fourth Circuit also held that "[i]n order to satisfy the requirement of good faith it is necessary for the *controlling person* to show that some precautionary measures were taken to prevent an injury caused by an employee." *Carpenter*, 594 F.2d at 394. This Court, moreover, has taken this holding as "indicat[ing] that it is the [defendant] who has the burden of asserting the defense and going forward with the evidence on the issue of good faith." *Haynes*, 508 F.Supp. at 1315; *cf. Davis v. Cole*, 999 F.Supp. 809, 814 (E.D.Va.1998) (citing *Haynes* ). Thus, *Carpenter* does not provide clear guidance in ascertaining the requirements of Section 20(a), and the meaning of Section 20(a) must therefore be determined independently. *See Haynes*, 508 F.Supp. at 1315 ("Obviously the burden rests with one party or the other, not with both.").

Indeed, the interpretation elucidated here reconciles the Fourth Circuit's conclusion in *Carpenter* that "Congress ... desire[d] to impose liability only on culpable participants in the acts perpetrated by the controlled person" with its recognition of the "good faith" defense, for "this congressional intent ... is furthered whether the plaintiff has to prove the defendant's culpability, or whether the defendant may avoid liability by proving good faith or the absence of culpable participation." *Duncan v. Pencer*, No. 94–Civ.–

Plaintiffs alleged a primary violation of the securities laws and control by the Control Group Defendants of MicroStrategy, they have satisfied the requirements of Section 20(a) at this early stage. In this regard, Plaintiffs—as discussed above—have successfully alleged a primary violation by MicroStrategy of the securities laws.[77] The only remaining issue, therefore, is whether Plaintiffs have adequately pled control by the Control Group Defendants.

The SEC defines "control" as "possession, direct or indirect of the power to direct or cause the direction of the management and policies of a person, whether through the ownership if voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b–2. A plaintiff satisfies the control requirement under this definition by pleading facts showing that the controlling defendant "had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws ... [and] had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability." *Brown v. Enstar Group, Inc.*, 84 F.3d 393, 396 (11th Cir.1996).[78] The question of whether someone qualifies as a controlling person under Section 20(a), moreover, is "a complex factual question." *SEC v. Coffey*, 493 F.2d 1304, 1318 (6th Cir.1974). As such, it is "not ordinarily subject to resolution on a motion to dismiss," and dismissal is appropriate only when "a plaintiff does not plead any facts from which it can reasonably be inferred the defendant was a control person." *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1306 (10th Cir.1998).

Here, the Complaint specifically alleges the positions within the Company of each Control Group Defendant (¶ 20(a)–(d)); that these Defendants prepared, reviewed, executed, and disseminated many, if not all, of the public reports and/or press releases issued by, and otherwise acted on behalf of, MicroStrategy (¶¶ 20, 26, 32, 34, 36–37, 39, 41–42, 44–49, 51, 53, 111, 116–18); and that these Defendants possessed significant voting power by virtue of their holdings of securities in MicroStrategy (¶ 20, 21). These allegations are sufficient to satisfy Section 20(a) and to prevent summary resolution at this early pleading stage, for, taken as true, they reasonably support the conclusion that the Control Group Defendants were control persons of MicroStrategy.[79] *See, e.g., Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp.*, 941 F.Supp. 1369, 1378 (S.D.N.Y.1996) (pleading substantial stock ownership of officer/director status from which control can be directly inferred provides sufficient basis to show control person liability). Accordingly, Defendants' motion to dismiss Count II of the Complaint must be denied.

## V. SECTION 20A OF THE EXCHANGE ACT

Finally, included as Count III in the Complaint is a claim by Named Plaintiff Vera Schwartz against Defendants Trundle and Ingari for insider trading in violation of Section 20A of the Exchange Act ("Section 20A").[80] Trundle and Ingari have moved to dismiss this count for failure to state a claim, arguing that Schwartz has failed (i) to allege a primary violation of the securities laws; (ii) to allege that her purchase of MicroStrategy stock was appropriately contemporaneous with Trun-

0321(LAP), 1996 WL 19043, at *17 (S.D.N.Y. Jan. 18, 1996)

77. *See supra* Section III.A.1.

78. *See also, e.g., Metge v. Baehler,* 762 F.2d 621, 631 (8th Cir.1985) (requiring a plaintiff to establish that "the defendant ... actually participated in (i.e., exercised control over) the operations of the corporation in general ... [and] that the defendant possessed the power to control the specific transaction or activity upon which the primary violation is

predicated") (internal quotation marks and citation omitted).

79. Even if Section 20(a) requires Plaintiffs to plead the culpable participation of the Control Group Defendants in MicroStrategy's violations of the securities laws, they have done so here, as discussed in Section III.A.1, *supra.*

80. For purposes of this Part, the term "Defendants" refers only to Defendants Trundle and Ingari.

dle and Ingari's sales of stock; and, (iii) that damages are available under Section 20A in this case. For the following reasons, Defendants' motion must be granted in part and denied in part.

■ Defendants' first argument in support of its dismissal is easily laid to rest. To survive a motion to dismiss, a complaint must contain a well-pled predicate violation of the Exchange Act. *See, e.g., In re VeriFone Sec. Litig.*, 784 F.Supp. 1471, 1488–89 (N.D.Cal.1992) ("A careful parsing of the somewhat tangled initial sentence of 20A discloses that an insider ... is liable only where an independent violation of another provision of the securities laws has occurred."), *aff'd* 11 F.3d 865 (9th Cir. 1993); *Simon v. American Power Conversion Corp.*, 945 F.Supp. 416, 436 (D.R.I. 1996). Here, as discussed above, Plaintiffs have successfully pled a violation of Section 10(b) and Rule 10b–5. *See supra* Section III.A.1. Accordingly, the motion to dismiss cannot succeed on this ground.

Section 20A provides for a private right of action to buyers and sellers of securities who trade "contemporaneously" with an insider in possession of material nonpublic information.[81] *See, e.g., Neubronner v. Milken*, 6 F.3d 666, 669 (9th Cir.1993); *In re Aldus Sec. Litig.*, No. C92–885C, 1993 WL 121478, at *7 (W.D.Wash. Mar. 1, 1993). This inquiry into contemporaneity proceeds from a recognition that "[s]ince identifying the party in actual privity with the insider is virtually impossible in transactions occurring on an anonymous public market, the contemporaneous standard was developed as a more feasible avenue

by which to sue insiders." *Buban v. O'Brien*, No. C 94–0331 FMS, 1994 WL 324093, at *3 (N.D.Cal. June 22, 1994). Put differently, the contemporaneity requirement serves as a substitute for the traditional requirement that

> only those clearly ascertainable individuals who stand to be exploited by the insider trading—for example, by personally trading with the insider or, in the context of the federal law, by trading on the same market with the insider—can be said to have individual interests that are directly implicated by the insider trading for which they may seek direct redress.

*Chanoff v. U.S. Surgical Corp.*, 857 F.Supp. 1011, 1021 (D.Conn.), *aff'd* 31 F.3d 66 (2d Cir.1994).[82] Thus, by requiring a showing of contemporaneity in the trades by the insider and the suing investor, Section 20A seeks to ensure that, where contractual privity would otherwise be impractical if not impossible to show, there nonetheless was a sufficiently close temporal relationship between the trades that the investor's interests were implicated by trades made by the insider while in possession of material, nonpublic information.

Section 20A, however, does not specifically define the term "contemporaneous," and the parties have not cited—nor does there appear to be—any circuit authority instructive on this point. Nor are decisions from courts in other circuits uniform; courts elsewhere have applied varying definitions of contemporaneity, ranging from requiring that the investor trade on the same date as did the insider,[83] to allowing as much as a month to pass between the

---

81. Section 20A provides, in part, that

> [a]ny person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

15 U.S.C. § 78t–1(a).

82. *See also In re Aldus*, 1993 WL 121478, at *7 ("[B]ecause it is often exceedingly difficult or impossible to determine with precision which purchasers of stock actually traded with an alleged insider, courts have replaced a strict privity requirement with the 'contemporaneous trade' approach, under which a plaintiff must show that he or she traded stock contemporaneously with the defendant.").

83. *See, e.g., Copland v. Grumet*, 88 F.Supp.2d 326, 338 (D.N.J.1999); *In re AST Research Sec. Litig.*, 887 F.Supp. 231, 234 (C.D.Cal. 1995); *In re Aldus*, 1993 WL 121478, at *7; *In re Stratus Computer, Inc. Sec. Litig.*, No.

trades,[84] with at least one court even holding that "the term 'contemporaneously' may embrace the entire period while relevant non-public information remained undisclosed."[85] Yet, as recognized by one district court, "the growing trend among district courts in a number of circuits ... is to adopt a restrictive reading of the term 'contemporaneous' at least with respect to shares heavily traded on a national exchange." *In re AST Research Sec. Litig.*, 887 F.Supp. 231, 233 (C.D.Cal. 1995). Indeed, an evolution of the contemporaneity requirement to require a shorter temporal separation between the trades of investors and insiders is reasonable, if not inevitable, as the modern realities of the securities markets support an increasingly strict application of contemporaneity in order at once to satisfy the requirement's privity-substitute function and to guard against "mak[ing] the insider liable to all the world."[86] Specifically, as the temporal separation between the trades increases,

the increasingly dynamic nature of the securities markets,[87] when viewed in light of the trading activity of the securities involved[88] and other circumstances in a particular case,[89] correspondingly makes it less likely that a purchaser traded with the insider and, therefore, "suffer[ed] the disadvantage of trading with someone with superior access to information."[90] Thus, a court assessing the appropriate measure of contemporaneity in any given case should be cognizant of these considerations.

Here, the Complaint alleges that Plaintiff Schwartz traded contemporaneously with Defendants Trundle and Ingari by purchasing MicroStrategy stock on October 25, 1999. (¶ 122.b.) According to the Complaint, Defendant Trundle traded on October 25, 26, and 27, 1999, and Defendant Ingari on October 22, 1999. (¶ 110.) In sum, Scwhartz traded on the same day as did Trundle, but three days after Ingari traded.[91] Clearly, therefore, Schwartz

Civ. A. 89–2075–7, 1992 WL 73555, at *5 (D.Mass. Mar. 27, 1992).

**84.** *See, e.g., In re Oxford Health Plans, Inc., Sec. Litig.,* 187 F.R.D. 133, 138 (S.D.N.Y. 1999) (five day gap); *In Re Cypress Semiconductor Litigation,* 836 F.Supp. 711 (N.D.Cal. 1993) (five day gap); *In re Engineering Animation Sec. Litig.,* 110 F.Supp.2d 1183 (S.D.Iowa 2000) (three day gap).

**85.** *In re American Bus. Computers Corp. Sec. Litig.,* [1995 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,839, at 93,055 (S.D.N.Y. Feb. 24, 1994).

**86.** *Shapiro v. Merrill Lynch,* [1975–1976 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,-377 (S.D.N.Y. Dec. 9, 1975).

**87.** For example, as the securities markets become more effective at tracking insider sales and thereby assimilating and dissipating the unfair advantage possessed by insiders, the less likely it becomes that a temporally remote purchaser would have been harmed by the insider sales. *See Colby v. Hologic, Inc.,* 817 F.Supp. 204, 216 (D.Mass.1993); *see also Buban v. O'Brien,* No. C 94–0331 FMS, 1994 WL 324093, at *4 (N.D.Cal. June 22, 1994) (noting that plaintiff could not have traded at an informational disadvantage vis-a-vis defendant "because the market had already absorbed defendant's sales prior to plaintiff's purchase" of the stock); *In re AST,* 887

F.Supp. at 234 (noting characteristics of NAS-DAQ index); Jonathan Macey and Geoffrey Miller, *An Analysis of Fraud on the Market Theory,* 42 Stan.L.Rev. 1059, 1073–74 (1990).

**88.** *See, e.g., Buban,* 1994 WL 324093, at *3 (considering volume of stock traded in concluding that plaintiff could not have bought defendant's shares); *In re Aldus,* 1993 WL 121478, at *7 (noting "the unquestionably high volume of [the company's] stock traded during the period in question" in holding that trades were not contemporaneous).

**89.** *See, e.g., Buban,* 1994 WL 324093, at *3 (The fact that plaintiff bought shares at a lower price than that at which defendant sold suggests that "plaintiff could not have traded with defendant.").

**90.** *Wilson v. Comtech Telecommunications Corp.,* 648 F.2d 88, 94 (2d Cir.1981); *see Buban,* 1994 WL 324093, at *3 ("While an actual trade between plaintiff and defendant need not be expressly shown, harm to the plaintiff is a necessary factor. Such harm may be found where it appears that the plaintiff might, in fact, have traded with the defendant.").

**91.** According to the Complaint, Defendants Saylor, Bansal, Lynch, and Terkowitz traded

traded contemporaneously with Trundle— a proposition that Defendants do not contest—and the Section 20A claim against Trundle cannot be dismissed on the contemporaneity ground.[92] *See, e.g., Copland v. Grumet,* 88 F.Supp.2d 326, 338 (D.N.J. 1999).

The claim with respect to Ingari, however, stands on a different footing, given the three-day temporal separation between Schwartz and Ingari's trades. The Complaint contains relatively few allegations as to the circumstances of Ingari's trade and of Schwartz's purchase. It alleges: (i) that there are 79.35 million combined shares of Classes A and B common stock outstanding (¶ 20.b); (ii) that MicroStrategy's common stock was traded on the NASDAQ National Market System and that the Company's options are traded on at least the American and Pacific Stock Exchanges (¶¶ 26, 83); (iii) that Ingari sold 10,000 shares on October 22, 1999, for $90; and (iv) that Schwartz purchased 15 shares of MicroStrategy stock on October 25, 1999, for $87.125 per share (¶ 122.b., App.). These allegations, however, are sufficient to warrant the conclusion that a one-day contemporaneity period is appropriate and that Schwartz's purchase was *not* contemporaneous with Ingari's sale. *See Buban,* 1994 WL 324093, at *3 (Allegations that (i)

plaintiff's broker bought 6,015 shares (of which plaintiff was allocated 2.8369 shares) (ii) three days after (iii) defendant sold 12,500 shares (iv) at a price higher than that which the broker paid (v) and broker bought on a day when 140,000 shares traded constituted "circumstances [under which] it is clear that plaintiff could not have traded with defendant" and that gave "no reason for the Court to apply a more liberal standard to determine contemporaneousness.")[93] Thus, Defendants' motion to dismiss Plaintiff Schwartz's Section 20A claim must be granted with respect to Defendant Ingari. In addition, insofar as Plaintiff Schwartz lacks standing to bring a claim against Ingari personally, and she is the sole claimant and class representative on the Section 20A count, Count III of the Complaint must be dismissed as to Defendant Ingari. *See Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 40, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *In re VeriFone Sec. Litig.,* 784 F.Supp. 1471, 1489 (N.D.Cal.1992) ("Where a plaintiff lacks standing to bring a claim personally, that plaintiff cannot represent the class.").

Finally, Defendants seek dismissal of Count III on the ground that the facts alleged reflect no cognizable damages that can be assessed under Section 20A. Dam-

*after* Plaintiff Schwartz traded. Schwartz cannot, therefore, raise a Section 20A claim against these Defendants, as her trade was not contemporaneous with these Defendants' trades. *See, e.g., In re Verifone,* 784 F.Supp. at 1489 ("No liability can attach for trades made by plaintiffs before the insider engages in trading activity."); *Backman v. Polaroid Corp.,* 540 F.Supp. 667, 670 (D.Mass.1982).

**92.** *See* MicroStrategy Brief, at 29–30 (urging only that "Plaintiffs' Section 20A claim as to Mr. Ingari should therefore be dismissed"); MicroStrategy Reply Brief, at 24 ("Nor can plaintiffs allege that Ms. Schwartz even possibly traded with Mr. Ingari, who sold three days prior to Ms. Schwartz's purchase.").

**93.** That MicroStrategy's shares are traded on the NASDAQ also argues against a more liberal application of the contemporaneity requirement in this case. As the Central District of California has observed:

Stock trading on NASDAQ occurs auction style; stock is sold to the highest bidder and purchased from the lowest offeror in every transaction. Thus, supply and demand determine whether stock transactions occur. [T]he fact that defendants "sold" shares over a seven-day period ... necessarily means that there were purchasers for the shares sold on each of these days. If there were no takers on these days, no stock transactions would have taken place.

Plaintiff['s] ... purchase ... was not made on any of the days the named defendants sold shares. This necessarily means that [plaintiff] could not have purchased any of the sales sold by the defendants, since the market had already absorbed these shares.

*In re AST,* 887 F.Supp. at 234. For similar reasons, Schwartz could not have traded with Ingari.

ages in an action under Section 20A are limited to the profits or losses avoided by the illegal transactions and are ordinarily measured by determining "the difference between the price the insider realizes and the market price of the securities after the news is released." *Short v. Belleville Shoe Mfg. Co.*, 908 F.2d 1385, 1392 (7th Cir. 1990); *see* 15 U.S.C. § 78t–1(b)(1). The date at which damages are measured should occur, however, no later than "a reasonable time after the inside information had been generally disseminated"— that is, after the market and defrauded sellers and buyers have had a reasonable time to digest the information. *SEC v. MacDonald*, 699 F.2d 47, 55 (1st Cir.1983). Damages are so limited because, while Section 20A in effect allows defrauded purchasers or sellers of securities to disgorge profits made or losses avoided by an insider in possession of material, nonpublic information, these purchasers and sellers are able to protect their interests by buying replacement or selling held shares upon the full public disclosure of previously withheld information. As such, extending the cut-off date for measuring damages beyond a reasonable time after disclosure would allow these purchasers and sellers "to speculate on the firm's future prosperity." *Id.*[94] The length of this reasonable time period varies with the circumstances of each case, therefore, for it is dependent on when the defrauded sellers or buyers reasonably should have digested the disclosed information and have taken steps to protect their interests. *See id.* ("[I]n determining what was a reasonable time ... the court should consider the volume and price at which ... shares [were] traded following disclosure, insofar as they suggested the date by which the news had been fully digested and acted upon by

investors."); *McGhee v. Joutras*, No. 94–C–7052, 1995 WL 124131, at *2, 1995 U.S.Dist. LEXIS 3542, at *5–6 (N.D.Ill. Mar. 20, 1995). In this regard, the determination of when a reasonable time has lapsed is highly fact-intensive and is typically unsuitable for threshold disposition.

The Individual Defendants, according to the Complaint, sold shares in 1999 at prices ranging from $37.63 to $94.15. (¶ 110.) But because, as the Complaint alleges, MicroStrategy implemented a 2–for–1 stock split on January 26, 2000, the per share value of these Defendants' alleged sales was effectively reduced in half, to between $18.815 and $47.075. (¶¶ 50, 58.) Moreover, the Complaint alleges that MicroStrategy's stock price fell to $86.75 after the March 20, 2000, disclosure. (¶ 58.) These facts, argue Defendants, show that the Individual Defendants did not avoid any losses attributable to material, nonpublic information through their sales, as the price of MicroStrategy shares on the day of disclosure did not fall below the price at which they sold. The Complaint alleges, however, that MicroStrategy did not formally restate its previously reported revenues and earnings until April 13, 2000 and May 30, 2000. (Complaint ¶ 61.) Plaintiffs also claim that the Company's stock price fell below $40 on April 13, 2000, which price is lower than Defendant Trundle's alleged post-split adjusted selling price of $42–$44. At this point, these allegations are enough to state a claim under Section 20A, for with further factual development it may be shown that information about MicroStrategy's accounting practices did not become fully digested in the market until the Company formally restated its financials, on which dates the stock had a price lower than that at which Defendant Trundle sold. Accordingly, it is too early

---

94. *See also, e.g., SEC v. MacDonald*, 699 F.2d 47, 53 (1st Cir.1983) ("[W]hen a seller of publicly traded securities has learned of previously undisclosed material facts, and decides nevertheless to replace the sold securities, he cannot later claim that his failure to obtain subsequent stock appreciation was a proximate consequence of his prior ignorance."); *Gerstle v. Gamble–Skogmo, Inc.*, 478

F.2d 1281, 1306 n. 27 (2d Cir.1973) ("Once the seller has discovered the fraud, he can protect against further damage by replacing the securities and should not be allowed to profit from a further appreciation, while being protected against depreciation by his right to recover at least the difference in value at the time of his sale.").

in the proceedings to resolve the question as a matter of law, and Defendant Trundle's motion to dismiss the Section 20A claim against him must be denied.

## VI. CONCLUSION

For the foregoing reasons, the motion by the MicroStrategy Defendants to dismiss the Complaint is **GRANTED IN PART** and **DENIED IN PART** as follows:

The motion to dismiss Count III of the Complaint as to Defendant Ingari is **GRANTED** and the motion is **DENIED** in all other respects. The motion by Defendant PricewaterhouseCoopers to dismiss the Complaint is **DENIED.**

An appropriate order shall issue. The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

# APPENDIX A

### Earnings Per Share

MicroStrategy, Summary of EPS, Restatements and Stock Price: 6/11/98 - 6/16/00

Stock Price